UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ASHLEY ROONEY, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | CV-06-20-B-W |
| | ) | |
| SPRAGUE ENERGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Afflicted with macular degeneration, Ashley Rooney challenges the decision of his employer, Sprague Energy Corp. (Sprague), to place him on an indefinite leave of absence, claiming that Sprague unlawfully discriminated against him because of his disability. Because there are genuine factual disputes about (1) the essential functions of his job, (2) whether he can safely perform those essential functions with or without accommodation, and (3) whether any accommodation will impose a hardship upon Sprague, the Court denies its motion for summary judgment.

## I.    FACTUAL BACKGROUND[1]

### A.    The Parties

Sprague is an energy company with a terminal in Searsport, Maine. *Def.'s Statement of Material Facts* ¶ 3 (Docket # 15) (DSMF); *Pl.'s Resp. to Def.'s Statement of Material Facts* ¶ 3 (Docket # 24) (PRSMF). Sprague handles a variety of products at the terminal, including fuel oil, petroleum, asphalt, and caustic soda. *Id.* Before being placed on an indefinite medical leave of absence on October 27, 2004, DSMF ¶ 260; PRSMF ¶ 260, Ashley Rooney had worked for Sprague at the Searsport terminal since 1983. DSMF ¶ 8; PRSMF ¶ 8. When placed on leave,

---

[1] Unless noted otherwise, the following facts are undisputed by the parties.

he held the title of Terminal Operator.  DSMF ¶ 33; PRSMF ¶ 33.  Duane Seekins was Mr. Rooney's boss and the terminal manager of the Searsport Terminal; William Littlefield was the assistant terminal manager; and John Didier was the managing director of terminal operations at Sprague.  DSMF ¶¶ 40, 74, 92; PRSMF ¶ 40, 74, 92.

### B.   Mr. Rooney's Claims

On February 3, 2006, Plaintiff filed suit in state court, alleging employment discrimination based on the Maine Human Rights Act (MHRA), 5 M.R.S.A. §§ 4551 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*  Sprague removed the case to this Court on February 9, 2006.  *See Notice of Removal* (Docket # 1).

### C.   The Terminal Operator Position

Sprague hired Mr. Rooney in 1983 as a watchman/yardman to load trucks with salt, coal, and caustic soda, check the boiler, moor vessels to the dock, and hook up hoses to the ship in order to off-load liquid cargo into tanks.  DSMF ¶¶ 9-12; PRSMF ¶¶ 9-12.  In October 2000, Sprague implemented a job description for the position of Terminal Operator, which Mr. Rooney held for four years before his leave of absence.  DSMF ¶ 33; PRSMF ¶ 33.  Aside from managerial positions, all current employees at the Searsport terminal are Terminal Operators. DSMF ¶ 35; PRSMF ¶ 35. The purpose behind the creation of the Terminal Operator job description was to have all employees cross-trained so that each could perform all duties of the job, DSMF ¶ 38; but it was not until 2002 that Sprague made the conscious decision to implement this plan.  PRSMF ¶ 38; *Didier Dep.* at 17:4-12 (Docket # 27).[2]  Thus, it was Mr. Didier's expectation that every terminal operator be able to perform every function of the job.

---

[2] Prior to 2002, the Terminal Operators were mostly cross-trained, but not a hundred percent.  DSMF ¶ 73; PRSMF ¶ 73.

DSMF ¶ 78.[3]   The October 2000 job description contains the following itemization of "major duties/responsibilities:"

> Operation of ticket booth
> Night watchman responsibilities
> Operation of large construction equipment (loader, bulldozer)
> Assist with mooring vessels
> Assist with offloading of cargo (connecting hoses)
> Loading railroad cars
> Operation of hoisting cranes
> Operation of conveyor system
> Supervise loading of caustic soda
> Gauging of oil tanks
> Assist with maintenance of grounds, buildings and/or equipment
> Participate in oil spill response drills
> Operation of boiler (with suitable license as required)
> Electrical repairs (with suitable license as required)
> Welding (with suitable training/certification as required)

DSMF Ex. 1 at 45.

Mr. Rooney recognized that he and his co-workers were required to learn all the jobs to work on tankers.  DSMF ¶ 66; PRSMF ¶ 66.  Mr. Rooney holds a valid boiler license.  DSMF ¶ 13; PRSMF ¶ 13.  For this aspect of his job, Mr. Rooney would check the boiler, read gauges, fill out paperwork, and ensure that "everything was working properly."  *Id*.  Before being diagnosed with macular degeneration, Mr. Rooney's boss – Mr. Seekins – informed Mr. Rooney that he needed to start performing more tasks, such as tank gauging and paperwork, and would have to learn to better use the computer.  DSMF ¶¶ 61, 64; PRSMF ¶¶ 61, 64.  During Plaintiff's annual review in both 2002 and 2003, Mr. Seekins instructed him that he needed to perform tank gauging functions while on tanker duty.  DSMF ¶ 93; PRSMF ¶ 93.

Beginning in October 2000, Mr. Rooney performed a variety of the functions of Terminal Operator, including security round duties, boiler functions, operation of the bucket loader to load

---

[3] Plaintiff's qualification does not adequately controvert the defendant's statement of material fact.  *See* PRSMF ¶ 78.

3

bulk product, minor maintenance on the loader, ticket booth duties, tanker duty, mooring functions, operation of the hopper, loading railroad cars, operation of the fuel truck between Bucksport and Searsport, and duties involving the transfer of caustic soda.  DSMF ¶¶ 80-91; PRSMF ¶¶ 80-91.  Although he used to perform work with caustic soda, Mr. Rooney no longer feels that he can safely do so, due to his eyesight problems.  DSMF ¶ 204; PRSMF ¶ 204.

Plaintiff concedes that one of his major job duties as a Terminal Operator was to operate large construction equipment, including fork trucks and a front end loader.  DSMF ¶ 141; PRSMF ¶ 141.  He used the loader to move salt, coal and gypsum rock, and the forklift to move bailed pulp and paper and tapioca.  DSMF ¶ 144-45, PRSMF ¶ 144-45.  Mr. Rooney's duties also included mooring vessels and offloading cargo by connecting hoses, loading railroad cars, and operating the conveyor system.  DSMF ¶¶ 152, 191, 198, 202; PRSMF ¶¶ 152, 191, 198, 202.  Although he never actually gauged tanks during his employment, Mr. Rooney agreed that, in general, it is a major part of the job of Terminal Operator, and part of his yearly evaluations focused on the need to perform that function.  DSMF ¶¶ 207-208; PRSMF ¶¶ 207-208.

### D.   Mr. Rooney's Deteriorating Eyesight

Mr. Rooney, now 59 years old, is afflicted with macular degeneration.  DSMF ¶ 226; PRSMF ¶ 226.  Although he first began having problems with his eyesight in January 2002, DSMF ¶ 227; PRSMF ¶ 227, he did not report the problem to Mr. Seekins until June 2004.  DSMF ¶ 228; PRSMF ¶ 228.  In March 2003, Dr. Linda Tyer conducted a Department of Transportation (DOT) evaluation,[4] which revealed that Mr. Rooney's vision did not meet the

---

[4] Such evaluations, which are to determine commercial driver fitness, generally occur every two years, but can happen more frequently depending on the circumstances.  DSMF ¶ 100; PRSMF ¶ 100.

DOT's minimum standards for vision in his right eye. DSMF ¶ 102.[5] But with corrected vision, Mr. Rooney's eyesight met DOT standards. *Id*. Because Mr. Rooney had "borderline high blood pressure" and was taking blood pressure medication, he only received a one-year DOT physical card from Dr. Tyer. DSMF ¶ 103; PRSMF ¶ 103. On June 21, 2004, Mr. Rooney went to Dr. Tyer on a follow-up visit for an accident that occurred June 4, 2004; at that time, Mr. Rooney realized that his one-year DOT physical card had expired. DSMF ¶¶ 104-105; PRSMF ¶¶ 104-105. Dr. Tyer, therefore, performed the DOT evaluation at that time, but discovered that, even with corrected vision, she could not "get a vision" out of his right eye. DSMF ¶ 106; PRSMF ¶ 106. Dr. Tyer completed the remainder of the evaluation, except for the vision portion, and instructed Mr. Rooney to return to complete the DOT physical exam and obtain a card after correcting his vision; however, he failed to return and complete the evaluation. DSMF ¶¶ 108-109; PRSMF ¶¶ 108-109.

Mr. Rooney first told Mr. Seekins about his eye problems after the incomplete evaluation with Dr. Tyer in June 2004. DSMF ¶ 228; PRSMF ¶ 228. After he discovered the situation, Mr. Seekins became concerned about how Mr. Rooney's eyesight affected his safety and ability to do his job. DSMF ¶¶ 228-29; PRSMF ¶¶ 228-29. On August 20, 2004, Mr. Rooney saw Dr. Thomas Flynn, an ophthalmologist with a practice that focuses on two areas: ocular inflammatory disease and uveitis; and medical retina. DSMF ¶¶ 265, 280; PRSMF ¶¶ 265, 280. It was Dr. Flynn who diagnosed Mr. Rooney with macular degeneration, pigment epithelial detachment in both eyes, with cysts. DSMF ¶ 278; PRSMF ¶ 278. According to Dr. Flynn, as of July 28, 2005, Mr. Rooney's condition had worsened, as Mr. Rooney's lenses had become more cataractous. DSMF ¶ 282; PRSMF ¶ 282.

---

[5] Plaintiff objects to this statement of material fact on the ground that the document upon which this statement is based – Dr. Linda Tyer's medical report – is hearsay. The Court overrules this objection under Fed. R. Evid. 803(6), as this is a record of regularly conducted activity.

On October 15, 2006, Mr. Rooney gave Mr. Seekins a letter from Dr. Flynn, confirming that Mr. Rooney had macular degeneration.  In the letter, Dr. Flynn discussed the findings from his August 20, 2004 evaluation.  DSMF ¶ 232; PRSMF ¶ 232.  In the letter, Dr. Flynn wrote that as of August 20, 2004, Mr. Rooney had 20/40 vision in his left eye and 20/400 vision in his right eye; this level of disparity between the two eyes severely impairs depth perception.  DSMF ¶¶ 235-36; PRSMF ¶¶ 235-36.  Dr. Flynn also reported that Mr. Rooney's right eye vision was significantly distorted, such that straight lines did not appear straight to Mr. Rooney.  DSMF ¶ 237; PRSMF ¶ 237.  In his opinion, climbing a ladder would be "unsafe and difficult to do." DSMF ¶ 238; PRSMF ¶ 238.

Growing increasingly concerned about safety, Mr. Seekins forwarded Dr. Flynn's letter to the human resources department at Sprague's Portsmouth, New Hampshire corporate office. DSMF ¶¶ 239-240; PRSMF ¶¶ 239-240.  Mr. Seekins also shared with human resources other incidents that he thought might have been related to Mr. Rooney's vision problems; namely, when Rooney fell on the boiler room stairs, struck a pole with his pickup truck, and struck another pole with the loader.  DSMF ¶¶ 241-42; PRSMF ¶¶ 241-42.  Sprague's human resources department shared Mr. Seekins's safety concerns and determined that it would not be responsible to have Mr. Rooney stay on site; human resources decided to send Mr. Rooney home immediately and then to assess and evaluate the situation further.  DSMF ¶ 243; PRSMF ¶ 243. Mr. Seekins told Mr. Rooney that he was being sent home until his eyes were "straightened out." DSMF ¶¶ 244-45; PRSMF ¶¶ 244-45.  Mr. Rooney applied for a medical leave of absence on October 27, 2004, which was granted; he remains an employee of Sprague on indefinite leave. DSMF ¶ 60; PRSMF ¶ 60.

After Sprague put Mr. Rooney on leave, Frank Easton, its Vice President of Human Resources, conferred with Mr. Seekins and Burt Russell, Vice President of Terminal Operations, to discuss whether, given his condition, Mr. Rooney could still safely perform the duties of a Terminal Operator. DSMF ¶ 247; PRSMF ¶ 247. Mr. Seekins believed he could not, because of his vision problems. DSMF ¶ 249; PRSMF ¶ 249. Mr. Easton, who based his opinion on Dr. Flynn's letter and Mr. Rooney's lack of depth perception, distortion, and vision of 20/400 and 20/40, also believed that Mr. Rooney could not safely perform his job, because Terminal Operators had to go up and down ladders and be able to respond to an incident or emergency. DSMF ¶¶ 252-53; PRSMF ¶¶ 252-53.[6] Mr. Easton concluded that there was no place where Mr. Rooney could operate or a role in which he could operate safely, whereupon Mr. Rooney applied for short-term disability. DSMF ¶¶ 257-58; PRSMF ¶¶ 257-58.

Mr. Rooney has conceded that, due to his vision problems, there are certain tasks he cannot safely perform, including gauging tanks or dealing with caustic soda. DSMF ¶ 223; PRSMF ¶ 223. These are two of the listed "major duties/responsibilities." In addition, he has trouble "getting names and numbers" when they are "going so fast." DSMF ¶ 262; PRSMF ¶ 262. As to remaining tasks, however, Mr. Rooney "think[s] [he] could do [them]" so long as there is plenty of light. DSMF ¶ 224; PRSMF ¶ 224.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law." Fed. R. Civ. P. 56(c); *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006).

---

[6] Rooney qualifies these statements, asserting that "Easton did not seek any clarification from Dr. Flynn . . . never discussed accommodations with Mr. Rooney . . . and did not consult Sprague's manager of health and safety." PRSMF ¶¶ 252-53.

Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Once the movant avers 'an absence of evidence to support the nonmoving party's case,' the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (citations omitted). A fact is "material" if it has the "'potential to affect the outcome of the suit under the applicable law.'" *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ." *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st. Cir. 1989) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

## III.   DISCUSSION

### A.   ADA Standard

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. The ADA's general rule states:

> No covered entity shall discriminate against a qualified individual
> with a disability because of the disability of such individual in
> regard to job application procedures, the hiring, advancement, or
> discharge of employees, employee compensation, job training, and
> other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.  To make out a *prima facie* case for employment discrimination under the

ADA, a plaintiff must prove, by a preponderance of the evidence, that "(1) he suffers from a

disability or handicap, as defined by the ADA and Chapter 151B, that (2) he was nevertheless

able to perform the essential functions of his job, either with or without reasonable

accommodation, and that (3) [his employer] took an adverse employment action against him

because of, in whole or in part, his protected disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d

100, 104 (1st Cir. 2005); *see also Harding v. Cianbro Corp.*, 436 F. Supp. 2d 153, 169 (D. Me.

2006).

Here, the first element is not contested.  Sprague recognizes that Mr. Rooney suffers from

macular degeneration, which is causing him to lose his vision.  *Def.'s Mot. for Summ. J.* at 15

(Docket # 14) (*Def.'s Mot.*).  Nor is the third element in dispute; Sprague makes no argument

that it placed Mr. Rooney on leave for any reason other than that his eyesight did not meet DOT

standards.[7]  Rather, Sprague simply argues the second element:  that, because of his condition, it

is not safe to keep Mr. Rooney employed as a Terminal Operator.  *Def.'s Mot.* at 25.  This

motion, therefore, focuses on whether Mr. Rooney was able to perform the essential functions of

the Terminal Operator position, either with or without reasonable accommodations.

**B.     Qualified Individual under the ADA and MHRA**

Mr. Rooney bears the burden of proof with respect to the second element; that is, that he

is "an individual with a disability who, with or without reasonable accommodation, can perform

---

[7] Because there is no issue of pretext, there is no need to engage in the familiar burden-shifting paradigm in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

the essential functions of the employment position that such individual holds or desires."  42

U.S.C. § 12111(8); *see also Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 24 (1st Cir. 2002).

This "qualified individual" inquiry is generally divided into two steps: "(1) whether the

employee could perform the essential functions of the job; (2) if not, whether any reasonable

accommodation by the employer would enable him to perform those functions."  *Ward v.

Massachusetts Health Research Inst., Inc.*, 209 F.3d 29, 33 (1st Cir. 2000).  "Moreover, if (and

to the extent that) essential job functions implicate the safety of others, the plaintiff must

demonstrate that [he] can perform those functions in a manner that will not endanger others."

*Gillen*, 283 F.3d at 24 (citing *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997)).

### 1.    Can Mr. Rooney perform the essential functions of his job?

To determine whether Mr. Rooney has met his burden, the first question in the "qualified

individual" analysis is:  What are the essential functions of the position?  While the plaintiff has

the burden of showing that he is capable of performing the essential functions, the defendant

"should bear the burden of proving that a given job function is an essential function."  *Ward*, 209

F.3d at 35 (noting that the defendant "has better access to the relevant evidence" to meet this

burden).

An essential function, under the ADA, is a "fundamental job duty of the position at issue

. . . [and] does not include the marginal functions of the position."  *Mulloy v. Acushnet Co.*, 460

F.3d 141, 147 (1st Cir. 2006) (quoting *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25 (1st Cir.

2001)).  The ADA instructs that "consideration shall be given to the employer's judgment as to

what functions of a job are essential, and if an employer has prepared a written description

before advertising or interviewing applicants for the job, this description shall be considered

evidence of the essential functions of the job." 42 U.S.C. § 12111(8).[8] The EEOC regulations

provide further guidance:

> Evidence of whether a particular function is essential includes, but is not limited to:
> (i)   The employer's judgment as to which functions are essential;
> (ii)  Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv)  The consequences of not requiring the incumbent to perform the function;
> (v)   The terms of a collective bargaining agreement;
> (vi)  The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The purpose of these provisions is "to ensure that an employer's

asserted requirements are solidly anchored in the realities of the workplace, not constructed out

of whole cloth." *Gillen*, 283 F.3d at 25.

The First Circuit has explained that the "inquiry into essential functions 'is not intended

to second guess the employer or to require the employer to lower company standards.'" *Mulloy*,

460 F.3d at 147 (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir.

2004)).[9] Also, the First Circuit "generally give[s] substantial weight to the employer's view of

job requirements.'" *Id.* (quoting *Ward*, 209 F.3d at 34); *Soto-Ocasio v. Federal Express Corp.*,

150 F.3d 14, 18 n.3 (1st Cir. 1998). However, "the employer's good-faith view of what a job

---

[8] The MHRA definition of "qualified individual" is similar to the ADA's definition. *Compare* 42 U.S.C. § 12111(8) ("an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *with* 5 M.R.S.A. § 4553(8-D) ("an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires"). However, unlike the ADA, the MHRA's definition of "physical or mental disability" does not require that a plaintiff pursuing a disability discrimination complaint prove the disability substantially limits a major life activity. *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, 895 A.2d 309. As the parties agree that Mr. Rooney suffers from a disability or handicap as defined by the ADA, he also meets the less stringent standards of the MHRA on this issue.

[9] *Mulloy* addressed whether physical presence at the work site was an essential function of the plaintiff's job as a senior electrical engineer. The First Circuit did not find a genuine issue of material fact from the plaintiff's "self-serving testimony," noting a reluctance "to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." 460 F.3d at 150 (quoting *Mason v. Avaya Commc'ns., Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004)). The court concluded that physical presence was an essential function of plaintiff's position. *Id.* at 153.

entails, though important, is not dispositive." *Gillen*, 283 F.3d at 25.  In determining whether an employee can perform essential functions, the employer may consider "an employee's actual limitations, even when those limitations result from a disability." *Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003).  In the end, this analysis "involves fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen*, 283 F.3d at 25.

### a.      Tank Gauging and Loading Caustic Soda

Reviewing the job duties of a Terminal Operator, Mr. Rooney admitted that, due to his vision problems, he does not feel safe either "[g]auging of oil tanks," because he would have to climb long ladders to the top of oil tanks, or performing tasks associated with the "loading of caustic soda," because of the hazardous nature of caustic soda.[10]  The issue is whether these are essential functions of the job, such that Mr. Rooney's failure to perform them, with or without a reasonable accommodation, would disqualify him.

Under the EEOC framework, 29 C.F.R. § 1630.2(n)(3), the first factor weighs in favor of Sprague, since it included both tank gauging and caustic soda loading as major job duties or responsibilities.  Thus, its "judgment as to which functions are essential" includes each task.[11] The next factor, "amount of time spent on the job performing the function[s]," favors Mr. Rooney.  From 1983 until October 2004, Mr. Rooney never gauged a tank while working for Sprague.  *Plaintiff's Statement of Additional Facts* ¶ 342 (Docket # 24) (PSAF); *Def.'s Resp. to*

---

[10] There appears to be a slight discrepancy between the job description, which requires that a Terminal Operator "[s]upervise the loading of caustic soda," DSMF Ex. 1 at 45, and Sprague's statement of material fact paragraph 223, admitted by Mr. Rooney, which reads:  "Rooney agrees he cannot safely perform gauging tasks or tasks with caustic soda due to his eyesight."  DSMF ¶ 223; PRSMF ¶ 223.  In his response, Mr. Rooney did not argue that there was a distinction between the supervision of the loading of caustic soda and the actual loading of caustic soda.  *Pl.'s Mem. of Law In Opp'n to Def.'s Mot. for Summ. J.* at 7-8 (Docket # 23) ( *Pl.'s Mem.*).

[11] Mr. Rooney attacks the accuracy of the job description, pointing out that there are several job tasks, including forklift operation, warehouse work, and truck officer duties, that he performed without difficulty, but that were not included in the written job description.  *Pl.'s Mem.* at 5-6.  Be that as it may, this factor still weighs in Sprague's favor, since the job description remains Sprague's judgment as to the essential functions of the job and, under the law, the employer's judgment is entitled to substantial weight.

*Pl.'s Additional Facts* ¶ 342 (DRPAF).[12]  Moreover, of the 153-170 vessels that Sprague handled at the Searsport terminal in 2005, only about 12 contained caustic soda.  PSAF ¶ 348; DRPAF ¶ 348.  The time Mr. Rooney spent on these two functions while he was still on active status appears to have been relatively minor.[13]  Next is the "consequences of not requiring the incumbent to perform the function[s]."  Here, two major consequences would flow from not requiring Mr. Rooney to perform all the Terminal Operator functions:  (1) Sprague's objective of cross-training and coordinating the Terminal Operator job functions would be stymied; and, (2) Sprague would be required to assign these functions to other Terminal Operators.  At Sprague, the ideal is for each Terminal Operator to be able to perform all aspects of the Terminal Operator position; in practice, however, "some men got assigned to do particular things and not other things."  PSAF ¶ 335, DRPAF ¶ 335.[14]  This factor generally favors Sprague.  Even though its

---

[12] Mr. Rooney's statement of additional facts reads:  "While gauging tanks has always been part of someone's duties at Sprague, Mr. Rooney never gauged tanks from 1983 to October 2004."  PSAF ¶ 335.  Sprague qualified its response to this statement, noting that in his annual evaluation for the period from June 2002 to June 2003, Mr. Seekins discussed with him areas that needed improvement, including the requirement that he undertake the tank gauging functions during tanker duty.  Mr. Seekins had a similar discussion with Mr. Rooney during the June 2004 annual review.  DRPAF ¶ 335.  Sprague's qualification helps explain its position about Mr. Rooney's failure to gauge tanks from 1983 to October 2004, but the Court does not interpret its response as denying that he never did so.

[13] Mr. Rooney points out that Sprague has not evaluated how much time a Terminal Operator actually spends on each separate essential function.  *Pl.'s Mem.* at 6; PSAF ¶ 326; DRPAF ¶ 326.  If Mr. Rooney never actually performed one task – the tank gauging – and the other task had to be performed only twelve times a year, it seems safe to conclude that the amount of time he actually spent on these two tasks, when combined, was relatively minor.

[14] Sprague cites the experience of another employee, Mr. Littlefield, who "performed welder duties about 25% of the time and the rest of the time he performed various duties within the Terminal Operator position, such as loader operator duties, watchman duties, and ticket booth duties."  DRPAF ¶ 335.  The following is an excerpt from Littlefield's deposition:

> Q:  Now, back when you started with Sprague and you were terminal operator/welder, how much of your time on your job duties was spent doing welding tasks?
> A:  I'm going to say it varied from day to day, but 25%.
> Q:  What did you do the rest of the time?
> A:  General operator, could be various other duties within the terminal operator duties.
> Q:  Did you, for example, run loaders and dozers?
> A:  Yes.
> Q:  Did you operate the crane?
> . . .
> A:  No, I did not run the crane.
> . . .

past practice may be significant, it appears that Sprague has been seeking to develop a new model, which contemplates greater flexibility among its Terminal Operators and hence greater economic efficiency.   The last two factors are the work experience of past and current incumbents in similar jobs and the extent to which other Terminal Operators specifically performed these two functions; however, there is little direct evidence in this record as to either factor.

The issue of essential functions is not commonly in dispute; but when it is, it often proves difficult to resolve at summary judgment, because the inquiry "involves fact-sensitive considerations and must be determined on a case-by-case basis."   *Gillen*, 283 F.3d at 25.   The case law in this circuit and others reflects this conclusion.   *See, e.g., Ward*, 209 F.3d at 35 (reversing summary judgment because, *inter alia*, "a reasonable factfinder could conclude that a regular and predictable schedule is not an essential function of [plaintiff's] position"); *Cruz v. McAllister Bros.*, 52 F. Supp. 2d 269 (D.P.R. 1999) (denying summary judgment because, *inter alia*, "there is a genuine issue as to the essential functions of an assistant port engineer" on the question of whether physical labor is an essential function of the job).   Although summary judgment on the essential function issue has been granted and affirmed, those cases are far more clear-cut than this case.   *See, e.g., Mulloy*, 460 F.3d 141 (affirming a grant of summary judgment, finding that an essential function of the employee's position – electrical engineer for a golf ball manufacturer – was to be physically present at the manufacturing plant); *Santiago Vera v. Williams Hospitality Group, Inc.*, 73 F. Supp. 2d 161, 167 (D.P.R. 1999) (ruling that attendance is generally an essential function of any job that cannot be performed off-site); *see*

---

Q:   Did you do the ticket booth?
A:   Yes.

*Littlefield Dep.* at 9:5-25.   It is important to note that Sprague's record citation tends to prove Mr. Rooney's point that not all Terminal Operators performed every task.   Mr. Littlefield testified that he never ran the crane, which is listed on the job description as a major duty or responsibility.

*also Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006) (plaintiff suffering from epilepsy did not dispute that operating heavy machinery was an essential function, when an employee in plaintiff's position spends 65% of his time operating heavy machinery).

Here, a reasonable factfinder could conclude that these two functions – tank gauging and loading caustic soda – are not essential functions of the Terminal Operator position.  One of them – tank gauging – Mr. Rooney never performed; the other – loading caustic soda – he rarely performed.  Also, contrary to Sprague's policy of having everyone perform all aspects of the job, it appears that at least one other employee does not perform all functions.  *See supra* note 15.  To the extent Sprague's actual practice regarding the Terminal Operator position conflicts with the functions in the job description, it may be that Sprague has been in transition on this issue, gradually tightening its requirements to reach its goal that each Terminal Operator be fully trained and capable of performing all the functions of the position.  Nevertheless, the extent to which its actual practice has or has not caught up with its written job description is, in essence, a factual, not legal determination.  Summary judgment is not appropriate on this issue.

### b.  Other Terminal Operator Functions

Next, Sprague argues that Mr. Rooney cannot satisfy his burden to demonstrate that he can perform the essential functions of his job safely.  *Def.'s Mot.* at 15.  In *EEOC v. Amego, Inc.*, the First Circuit held:

> [I]n a Title I ADA case, it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore "qualified."  Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others. There may be other cases under Title I where the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden.

110 F.3d at 144.  To apply this standard, the court must determine that there are essential job functions that "necessarily implicate the safety of others."  Even though the essential functions of the Terminal Operator position may be in dispute, there are certain aspects of Mr. Rooney's job that could implicate the safety of others.  Employment at Sprague's Searsport terminal inevitably involves working with hazardous and sometimes dangerous materials.  DSMF ¶¶ 136-37; PRSMF ¶¶ 136-37.  Under *Amego*, therefore, the heightened burden obtains, and Mr. Rooney must "demonstrate that []he can perform those functions in a way that does not endanger others." *See Celotex*, 477 U.S. at 322, *Amego*, 110 F.3d at 144.

To begin, Mr. Rooney claims that, at the time he left in October 2004, he could "safely perform all duties of his job with the exception of gauging tanks and working with caustic soda."[15]  PASMF ¶ 340.  Based on the testimony of his ophthalmologist, Dr. Thomas Flynn, Mr. Rooney claims he is capable of performing a number of job duties, including "scale truck," assisting drivers with loading, operating the "Sorrento automation system," ensuring accuracy of bills of lading, maintaining the MTSA security sign-in list, monitoring security cameras, conducting security detex rounds (which includes operation of a security vehicle), performing boiler checks, operating large construction equipment (bulldozer, loader), assisting with the mooring of vessels and offloading of cargo, loading railroad cars, operating the conveyer system, participating in oil spill response drills, and inspecting the terminal piping system for leaks. PASMF ¶¶ 362-377.[16]  Plaintiff further argues that "it is undisputed that Mr. Rooney was

---

[15] Sprague agreed that Mr. Rooney cannot safely perform tank gauging and caustic soda duties.  However, it denied the remainder of this statement of material fact, noting that in his deposition, Mr. Rooney himself qualified his statement by saying that he thought he could do the rest of the work, "[a]s long as they got plenty of light."  DRPAF ¶ 340; *Rooney First Dep.* at 39:19-23 (Docket # 33).

[16] Sprague has not denied that Mr. Rooney is capable of performing these functions, but has qualified all his statements:

These are inadmissible opinions that are not reliable and [which] Dr. Flynn is not qualified to render and none address the issue of safety.  Dr. Flynn made

actually performing all duties except gauging tanks in a satisfactory manner up until the day he was sent home." *Pl.'s Mem.* at 8; *Rooney First Depo.* at 23:7-16; 39-40.  In fact, according to Mr. Rooney, he could perform them even today.  *Id.*  Moreover, Sprague waited until Plaintiff filed suit to hire a vocational expert, who concluded that it was unsafe for Plaintiff to work as a Terminal Operator.  *Id.*

In response, Sprague contends that Mr. Rooney's past performance cannot establish that he is currently qualified.  *See Def.'s Reply Br. in Supp. of Mot. for Summ. J.* at 2-3 (Docket # 25) (*Def.'s Reply*) (citing *Mole v. Buckhorn Rubber Prod., Inc.*, 165 F.3d 1212, 1217 (8th Cir. 1999)).[17]  Here, despite Sprague's contention to the contrary, the evidence of diminished or deteriorated abilities is disputed.  *See Def.'s Reply* at 3.  With respect to Mr. Rooney's 2002 annual evaluation, Mr. Seekins reported that Mr. Rooney was "slow in accepting that he needed to learn to perform these duties and lacked a can-do attitude.  Overall, he received a good annual evaluation."  *Seekins Aff.* ¶ 20.  For Mr. Rooney's 2003 and 2004 annual evaluations, Mr. Seekins averred that Mr. Rooney "had a more 'can-do' attitude . . . [but] that he still needed to undertake the tank gauging functions during tanker duty, as well as better learn the paperwork

---

assumptions about the tasks that Terminal Operators performed under the essential major duties and responsibilities. . . .  Dr. Flynn has a limited understanding of occupational safety.  He has no training in job assessment, has never performed job assessment and is not qualified to perform a job assessment. . . .  Dr. Flynn did not make reference to the Federal Dictionary of Occupational Titles, does not have this book and has never used this book.

DRPAF ¶¶ 362-375.  Sprague's objection is overruled.  Dr. Flynn is extremely well qualified as an ophthalmologist; the extent to which his opinions are grounded in actual job functions goes to weight, not admissibility.

[17] *Buckhorn Rubber* is a much different case than the case at bar.  In *Buckhorn Rubber*, the employer fired the plaintiff because of several documentations of poor job performance, and subsequently she brought suit, alleging discrimination due to multiple sclerosis.  *Id.* at 1216.  The Eighth Circuit noted that the plaintiff, who was working as a customer service coordinator, was required to take and enter orders accurately and to respond to customer inquires and complaints.  *Id.* at 1217.  The Court pointed out that the plaintiff did not contest that she had made errors over an extended period.  *Id.*  The Eighth Circuit held: "An ADA plaintiff may not rely upon past performance to establish that she is a qualified individual *without accommodation* when the employer has produced undisputed evidence of diminished or deteriorated abilities." *Id.* at 1217 (emphasis in original); *see also Williams v. HealthReach Network*, Civil No. 99-0030-B, 2000 U.S. Dist. LEXIS 9695 (D. Me. Feb. 22, 2000) (applying *Buckhorn Rubber* to a similar situation where the employee's performance had deteriorated).  Here, Mr. Rooney disputes Sprague's contention that his ability to perform the job has diminished or deteriorated.

function of the PIC duty and still required studying of the safety modules." *Id*. ¶ 23.  Based on Mr. Seekins's annual reviews, a reasonable factfinder could infer that Mr. Rooney's performance was actually improving, not deteriorating.  Moreover, the only rationale that Mr. Seekins provided for placing Mr. Rooney on leave was his eyesight problem and the potential safety concerns, not that he was performing his job poorly.  Viewing the evidence in the light most favorable to Mr. Rooney, he was able to satisfactorily perform nearly all of his job duties – without accommodation – until the time he was placed on leave.  Since there is evidence that his eyesight has not subsequently worsened, there is a reasonable inference that he could now resume performance of the bulk of his job satisfactorily, despite the problems with his eyesight.

Next, Sprague argues that Mr. Rooney is unable to safely operate large construction equipment.  Without a valid DOT license, Mr. Rooney cannot operate commercial vehicles – which include a fuel truck and boom truck.  DSMF ¶¶ 216, 217.[18]  Nevertheless, Sprague concedes that there is no current need for someone to operate a fuel truck.[19]  *Def.'s Mot*. at 17. While Mr. Rooney asserts that he can still operate a front end loader and fork truck (which do not require a DOT license), Sprague contends that Mr. Rooney's vision problems prevent him from performing these functions.  First, the job would inevitably entail driving the front end loader in the dark, which Mr. Rooney said he cannot do.  *Id*.  Second, Mr. Rooney would have to

---

[18] Sprague's statement of material fact paragraph 216 states:  "Rooney could no longer drive the boom truck because he was unable to pass the DOT eye examination to obtain his physical card to operate a commercial vehicle."  Mr. Rooney denied this statement, saying that the cited record references do not support the assertion in the paragraph. PRSMF ¶ 216.  Mr. Rooney is incorrect.  Sprague's citation is to a portion of Mr. Rooney's deposition, where he admits that before he lost his DOT physical card, he was fully legal to operate a truck during emergency drills between terminals, but after he lost his DOT card, he had to stop.  *Rooney First Dep*. at 49:5-18.  It takes a bit of work to clarify what truck Mr. Rooney was being questioned about when he made this admission, but by backtracking, it is clear that he was discussing the operation of the boom truck.  *Id*. at 36:13-17.  Mr. Rooney's denial is frivolous and is overruled.

[19] Sprague's reference to the boom truck is limited to the assertion that once he failed to pass his DOT physical exam, he "could no longer operate the fuel truck or the boom truck for emergency response drills . . . ."  *Def.'s Mot*. at 17.  Sprague does not further address the boom truck.  This function is not expressly listed in the job description and the record is much too cryptic to allow any conclusion about whether operation of the boom truck is an essential function of the Terminal Operator's job.

climb a ladder to get into these vehicles.  Finally, Sprague argues that his deteriorated vision poses serious safety concerns to the point where he cannot safely operate large construction equipment.  *Id.* at 18.  Mr. Rooney counters that he only has problems with climbing tall ladders (such as to the top of an oil tank), not a ladder into a front end loader or a fork truck.  He further argues that the Terminal Operator job description does not require a commercial driver's license, nor would he need one to operate a front end loader or a fork truck.  On this issue, there is a clear factual dispute as to Mr. Rooney's ability to perform this aspect of his position at Sprague.

### c.  Summary:  Ability to Perform Essential Functions of Terminal Operator Position Without Accommodation

In sum, Sprague argues that, due to his macular degeneration, Mr. Rooney cannot safely perform the essential functions of the Terminal Operator position.  Mr. Rooney contends that, up until the time he was put on leave, he was performing his job in a satisfactory manner and could still do so if working there today.  He further argues that when he was employed as a Terminal Operator, he did not actually perform a number of the tasks Sprague now contends are essential and that, as regards another set of tasks he can no longer perform, those duties are non-essential.  When measured against the obligation to view the evidence in the light most favorable to Mr. Rooney, however, the state of the record does not allow a definitive conclusion as to whether Sprague or Mr. Rooney is correct and this necessarily generates a genuine issue of material fact.

### 2.  Is there a reasonable accommodation?

Having concluded that there is a genuine issue of material fact as to the essential functions of Mr. Rooney's job, the inquiry could theoretically end there.  However, even if there were no dispute as to the essential functions of the job, summary judgment is still unavailable to Sprague.  The next step of the inquiry is whether Sprague could provide a reasonable accommodation that would allow Mr. Rooney to perform his job despite his disability.

Under the ADA, the definition of "discriminate" is not limited to termination of employment; rather, an employer violates the ADA if it fails to "mak[e] reasonable accommodations . . . of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."   42 U.S.C. § 12112(b)(5)(A); *see also Mulloy*, 460 F.3d at 148.

### a. Reasonable Accommodation

The term "reasonable accommodation," as defined in the Code of Federal Regulations, means: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position . . . ."   29 C.F.R. § 1630.2(o)(ii).   "'The law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous.'"   *Mulloy*, 460 F.3d at 153 (quoting *Kvorjak v. Maine*, 259 F.3d 48, 57 (1st Cir. 2001)); *see also Calef*, 322 F.3d at 86 n.8 ("An employer has no duty to modify an essential function of a job.   If the plaintiff, with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate.");[20] *Soto-Ocasio*, 150 F.3d at 20 ("[T]he ADA does not require an employer 'to reallocate job duties in order to change the essential function of a job.'" (quoting *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995)); *Laurin v. Providence Hosp.*, 150 F.3d 52, 56 (1st Cir. 1998) ("It is well settled that an employer need not

---

[20] In *Calef*, the plaintiff suffered from attention deficit hyperactivity disorder (ADHD).  The employer concluded that the plaintiff, who was a production manager, was unable to handle stressful situations.  322 F.3d at 86.  The First Circuit concluded that this is an essential function, because it is both job-related and consistent with business necessity.

accommodate a disability by foregoing an 'essential function' of the employment position."); *Lloyd v. Hardin County*, 207 F.3d 1080, 1084 (8th Cir. 2000) (holding that an employer cannot be required under the ADA to provide an accommodation to an employee that would "entail reallocating one or more of the essential functions of [the employee's] job, which he cannot perform with or without reasonable accommodation.").[21]

"Under the ADA, the employer avoids all liability if the plaintiff would have been fired because incapable of performing the essential functions of the job . . . ." *Laurin*, 150 F.3d at 56 (quoting *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 484 (7th Cir. 1997)). The ADA does not require an employer "to create a new job for an employee." *Mulloy*, 460 F.3d at 153.

Mr. Rooney suggests that there are two reasonable accommodations that would allow him to continue as a Terminal Operator, despite his disability. With respect to the two functions he cannot perform safely, he proposes that (1) Sprague could continue to excuse him from gauging tanks, a task he never performed at Sprague; and, (2) because caustic soda is dealt with so infrequently, Sprague could, without hardship, assign him to a different task. With respect to the remaining parts of his job, Mr. Rooney asserts that he can perform them as long as he is provided with enhanced magnification and sufficient light. Sprague objects on the ground that Mr. Rooney bases his assertions on the opinions of Dr. Flynn, who has no experience in making occupational assessments. In response, Sprague offers an affidavit of its vocational expert, Evelyn Hartman, who opined that Mr. Rooney "could not, and still cannot now, safely perform

---

[21] In *Lloyd*, the plaintiff's position with the county's road department included maintenance of drainage tiles, removing snow from roads in a "road maintainer," and clearing brush from ditches. 207 F.3d at 1082. The plaintiff was injured in a non-work related spinal injury, which resulted in the loss of feeling in his lower legs. *Id*. The plaintiff was terminated when his employer determined that it was not possible for the plaintiff to safely get in and out of the road maintainer. *Id*. The plaintiff admitted that he could not perform the tiling or brush clearing work, but argued that he could drive a road maintainer year round, which would be a reasonable accommodation. *Id*. The Eighth Circuit sided with the employer and affirmed summary judgment. *Id*. at 1085.

the functions he performed in 2004, and that there is not reasonable accommodation . . . that would allow Mr. Rooney to perform those functions safely."[22]

As this issue hinges on which expert is more credible and credibility determinations are for the trier of fact, the motion for summary judgment must be denied for this reason alone.  In addition, the fact finder must decide whether Mr. Rooney's request amounts to a reallocation of essential job duties, after identifying which aspects of the job are "essential functions."

### b.  Hardship to Sprague

The other side of the equation is the hardship such an accommodation would cause the employer.    The First Circuit has acknowledged that, in practice, "showing that the accommodation is not reasonable, or that it imposes an undue hardship," is the same thing. *Ward*, 209 F.3d at 37 (citing *Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)). "Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business."  *Tobin*, 433 F.3d at 106; 42 U.S.C. § 12112(b)(5)(A).  The ADA defines "undue hardship" as "an action requiring significant difficulty or expense . . . ."  42 U.S.C. § 12111(10)(B).[23]  To satisfy its burden, the

---

[22] Mr. Rooney points out that Sprague did not seek this expert evaluation until after he filed suit.  Indeed, an attachment to Ms. Hartman's affidavit reflects that she sent her report to Sprague's attorneys in a letter dated August 26, 2006.  Mr. Rooney argues:

> Here, there is a genuine issue of material fact as to whether, at the time it told Mr. Rooney to go home, Sprague had any factual basis for believing that a reasonable probability existed that Mr. Rooney's vision would prevent him from performing his duties in a manner which would not endanger the health or safety of himself or others.

*Pl.'s Mem.* at 9.
[23] The statute lists several relevant factors, including "the nature and cost of the accommodation;" "the overall financial resources of the [employer] . . . ; the overall size of the business of the [employer] with respect to the number of its employees; [and] the number, type, and location of its facilities."  42 U.S.C. § 12111(10)(B); *see also* 29 C.F.R. § 1630.2(p).  This record does not permit undisputed findings about these factors.

employer "must submit some evidence in support of its position that the requested accommodation would impose undue hardship." *Ward*, 209 F.3d at 36.

While Sprague rightly contends that "the law does not require an employer to change the essential functions of the job," *Def.'s Mot.* at 24, the ADA includes "job restructuring" and "part-time or modified work schedules" as possible reasonable accommodations.  42 U.S.C. 12111(9); *see also Ward*, 209 F.3d at 36.  Further, Sprague has not demonstrated that accommodating Mr. Rooney would result in an undue hardship.  Instead, it makes the general argument that Mr. Rooney's continued employment "presents a safety risk for [him], his co-workers, visiting customers, as well as the environment."  *Def.'s Mot.* at 25.  Sprague's argument alone is insufficient to rule that Mr. Rooney's proposed accommodations would pose an undue hardship as a matter of law.

### C.    Direct Threat – Safety Defense

Leaving no stone unturned, Sprague raises as an "alternative basis" for summary judgment the ADA's direct threat affirmative defense, and argues that "the evidence overwhelmingly establishes Maine's safety defense."  *Def.'s Mot.* at 22-23.  According to Sprague, Mr. Rooney "poses a direct threat to his own safety, as well as his co-workers."  *Id.* at 23.[24]  Mr. Rooney counters that such fears are based on "illegal stereotypes and the speculative possibility of harm."  *Pl.'s Mem.* at 15.

The EEOC regulations define "direct threat" to mean "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r); *see also* 42 U.S.C. § 12111(3).  Under the "Defenses" section of the ADA, the statute provides that "[t]he term 'qualification standards'

---

[24] Under First Circuit case law, an evaluation of "direct threat" is part of the "qualified individual" analysis. *See Amego*, 110 F.3d at 143.  The Court has already analyzed the direct threat issue above, in accordance with *Amego*.

may include a requirement that an individual shall not pose a direct threat to the health or safety

of other individuals in the workplace."  42 U.S.C. § 12113(b); *see also* 29 C.F.R. § 1630.15(b)(2)

(extending the defense for threats to the safety of the individual).  To determine whether a direct

threat exists, the regulations provide:

> The determination that an individual poses a "direct threat" shall
> be based on an individualized assessment of the individual's
> present ability to safely perform the essential functions of the job.
> This assessment shall be based on a reasonable medical judgment
> that relies on the most current medical knowledge and/or on the
> best available objective evidence. In determining whether an
> individual would pose a direct threat, the factors to be considered
> include:
>
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).  Here, the Court has already considered the direct threat issue in the

context of whether Mr. Rooney is a qualified individual, and determined that there is a genuine

issue of material fact.  For the same reason, Sprague is not entitled to summary judgment based

solely on this affirmative defense.

Sprague's argument for Maine's safety defense fares no better.  "The Maine safety

defense permits handicap-based employment discrimination in individual cases when the

employee's handicap renders him 'unable to perform his duties or perform those duties in a

manner which would not endanger the health or safety of the employee or the health or safety of

others. . . .'"  *Maine Human Rights Comm'n v. Canadian Pac., Ltd.*, 458 A.2d 1225, 1233 (Me.

1983) (quoting 5 M.R.S.A. § 4573(4)).  This defense "requires individual assessments of the

relationship between an employee's handicap and the specific legitimate requirements of his

job."  *Id.* at 1234.  Unlike the ADA direct threat defense, the burden is squarely upon the

employer to establish that, "to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or safety of others." *Id*. Thus, the standard requires a "strong factual basis." *Id*.

Although at trial Sprague might establish its direct threat defense and the Maine safety defense, there remains a genuine dispute of material fact as to Mr. Rooney's ability to perform his job safely. Ms. Hartman, a "vocational expert," says he cannot; Dr. Flynn, a medical doctor specializing in Mr. Rooney's affliction, says that he can with the proper accommodations. Given this dispute, Sprague is not entitled to summary judgment.

## IV.    CONCLUSION

The Court concludes that there is a genuine issue of material fact as to (1) the essential functions of the Terminal Operator position; (2) whether Mr. Rooney was able to safely and adequately perform the remaining tasks of the job when he was sent home; and, (3) whether there exists a reasonable accommodation that would allow Mr. Rooney to continue performing his job without posing an undue hardship to Sprague. The Court DENIES Sprague's Motion for Summary Judgment (Docket # 14).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2007