UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ASHLEY ROONEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-06-20-B-W |
| | ) | |
| SPRAGUE ENERGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON EQUITABLE REMEDIES

Following a jury verdict which found that Sprague Energy Corp. (Sprague) discriminated against its employee Ashley Rooney because of his physical disability, the Court orders Sprague to reinstate Mr. Rooney and orders back and front pay to the date of reinstatement.  In addition, the Court concludes that Mr. Rooney failed to mitigate his back pay damages as required by Maine law and reduces the back pay award by the amount he could have earned with reasonable diligence.

## I.     STATEMENT OF FACTS

By verdict issued on October 30, 2007, a jury found that Sprague discriminated against Ashley Rooney because of his physical disability.  *Special Verdict Form* (Docket # 133).  It awarded $300,000 in compensatory and $150,000 in punitive damages.  *Id.*  Mr. Rooney now requests the following additional relief:  (1) back pay from October 27, 2004, to the date of judgment; (2) reinstatement to his former job; (3) if reinstatement is not granted, front pay from the date of judgment until his probable retirement date; and, (4) prejudgment interest on the

compensatory and back pay damages awards.[1]   *Pl.'s Mem. of Law Regarding Equitable Remedies* at 1 (Docket # 160) (*Pl.'s Mem.*).  Sprague objects to each demand.   *Def.'s Opposing Mem. of Law Regarding the Issues of Safety and Equitable Remedies* (Docket # 163) (*Def.'s Op.*).  Mr. Rooney has replied.   *Pl.'s Reply Mem. Regarding Equitable Remedies* (Docket # 164) (*Pl.'s Reply*).  The Court held an evidentiary hearing on January 16, 2008, addressing the issues of front pay, back pay, and reinstatement (Docket # 157).

### A.     The Stipulation of the Parties

The parties have stipulated:

(1)     Mr. Rooney received short term disability payments starting October 27, 2004, for a period of twenty-six weeks.

(2)     Sprague paid the entirety of Mr. Rooney's short term disability (STD) payments directly to him and no part of the payments was from an insurance policy.  Mr. Rooney did not fund or contribute any amount under Sprague's STD Policy.  In 2004, Sprague paid Mr. Rooney $5,040, and in 2005, Sprague paid $7,136, ending on April 25, 2005.

(3)     After Mr. Rooney's STD payments were discontinued, Mr. Rooney began to receive long term disability (LTD) benefits.  Sprague solely funded these benefits under an insurance policy. Initially, Mr. Rooney received a LTD payment of $1,352 per month, but when he was awarded Social Security disability benefits, his LTD payment was retroactively reduced to $100 per month, beginning April 25, 2005.  For the purposes of the Court's analysis, the parties agree that the Court should consider the LTD payment to be $100 per month.  The payments are ongoing and will continue for so long as Mr. Rooney qualifies for them.

---

[1] Mr. Rooney concedes that since Sprague employs more than 201, but fewer than 500 employees, the compensatory damages award of $300,000 must be reduced to $200,000.  5 M.R.S.A. § 4613.  *See Pl.'s Mem.* at 1.

(4)     Mr. Rooney's total income from Sprague for 2004 was:

| | |
|---|---|
| Straight time | $24,224.00 |
| Overtime | $ 6,530.40 |
| Safety Awards | $    348.84 |
| On the spot awards | $    232.75 |
| Bonuses | $ 1,689.00 |
| STD | $ 5,040.00 |
| | |
| Total | $ 38,064.99 |

(5)     Mr. Rooney's total income from Sprague for 2003 was:

| | |
|---|---|
| Straight time | $28,508.00 |
| Overtime | $10,976.41 |
| Awards | $    899.38 |
| Bonuses | $    447.00 |
| | |
| Total | $40,830.79 |

(6)     Mr. Rooney's total income from Sprague for 2002 was:

| | |
|---|---|
| Straight time | $27,075.20 |
| Overtime | $ 8,005.37 |
| Awards | $    230.00 |
| Bonuses | $    541.00 |
| | |
| Total | $35,851.57 |

(7)     Sprague paid all premiums for the LTD policy; it paid no premiums for the STD policy, since it was not insured.  The STD and LTD payments to Mr. Rooney were taxable income.

(8)     From the time of his active employment to now, Mr. Rooney has been and remains a plan participant in the Sprague health insurance plan on the same terms and conditions as Sprague's active employees.

(9)     Joint Exhibit # 9, which Sprague says reflects the regular overtime and total earnings of terminal operators at Sprague, is admissible.

*Stipulation* (Docket # 154).

### B.    The Issues

#### 1.    Maine Safety Defense

Sprague contends that it should prevail on the Maine Safety Defense, and the Court should therefore reject Mr. Rooney's demands. *Def.'s Op.* at 1-14. Mr. Rooney replies that Sprague is attempting to relitigate issues previously decided by the jury. *Pl.'s Reply* at 1. The Court has separately addressed the Maine Safety Defense and ruled against Sprague. *Order on Safety Defense* (Docket # 165).

#### 2.    Reinstatement

Mr. Rooney asks for an order to compel Sprague to reinstate him to his position as a terminal operator. *Pl.'s Mem.* at 10. He argues that the jury's finding that he was a qualified individual mandates the conclusion that he is able to perform his job at Sprague with reasonable accommodation. *Id.* He dismisses Sprague's contention that the terminal operator job has changed, noting that Sprague elected not to present any new evidence on this issue. *Id.*

Sprague objects to a reinstatement order. *Def.'s Op.* at 17-20. Sprague says that Mr. Rooney "cannot perform each essential function of the job with or without reasonable accommodation, nor can he perform his job duties in a manner that will not endanger his safety or others." *Id.* at 17.

#### 3.    Back Pay

Mr. Rooney seeks a money judgment for back pay from October 27, 2004, the date he was placed on leave of absence, to the date of the judgment. *Pl.'s Mem.* at 8. He calculates back pay to equal $106,923.28 from October 28, 2004 to December 31, 2007, with additional losses accruing at $643.35 per week. *Id.* at 9.

Sprague objects to an award of any back pay. *Def.'s Op.* at 14-20. It says that Mr. Rooney failed to mitigate his back pay damages by removing himself from the labor market and by failing to apply for a single job. *Id.* at 14-15. Also, to the extent he is totally disabled, Sprague argues Mr. Rooney is not entitled to a back pay award. *Id.* at 16.

### 4.      Front Pay

If reinstatement is not ordered, Mr. Rooney claims front pay from the date of judgment until his expected retirement date. Mr. Rooney says he would have retired at age sixty-five. *Pl.'s Mem.* at 11. Sprague responds that Mr. Rooney is not entitled to any front pay, because he planned to retire at age fifty-seven and because he has removed himself from the labor market. *Def.'s Op.* at 15.

### 5.      Prejudgment Interest

Mr. Rooney demands prejudgment interest on the compensatory damages and back pay awards. *Pl.'s Mem.* at 1. Sprague did not respond to this portion of Mr. Rooney's argument, but stressed that prejudgment interest is not available on the punitive damages portion of the verdict. *Def.'s Op.* at 20.

## II.      DISCUSSION

The Court does not begin its analysis with a blank slate; a jury has spoken and resolved a number of issues. *Harding v. Cianbro Corp.*, 473 F. Supp. 2d 89, 95 (D. Me. 2007) ("Under the Seventh Amendment, the judge is bound by the jury's decision on all issues common to the requests for legal and equitable relief."). In evaluating the claims for and the defenses against equitable relief, the Court will first apply the jury verdict to controverted questions and will then resolve separately only those issues not foreclosed by the verdict.

It should be noted what the pending motion is not.  Despite Sprague's earnest and strongly worded attack, Mr. Rooney's motion for equitable relief is not the procedural vehicle for Sprague to inveigh against the jury verdict.  At this point, the Court assumes the legality of the verdict and applies it to the remaining pending issues.  Sprague may wish to challenge the judgment, but if it does, its motion will be evaluated under the applicable legal standards.  *See* Fed. R. Civ. P. 59(a), 60(b).

### A.    Reinstatement

#### 1.    The Legal Standards

Reinstatement is a remedy for unlawful discrimination under the Maine Human Rights Act (MHRA).  5 M.R.S.A. § 4613(2)(B)(2) ("If the court finds that unlawful discrimination occurred, its judgment must specify an appropriate remedy or remedies for that discrimination. The remedies may include . . . [a]n order to employ or reinstate a victim of unlawful discrimination . . . .").  Maine law vests the trial judge with discretion to fashion an appropriate remedy.  *Rozanski v. A-P-A Trans., Inc.*, 512 A.2d 335, 342 (Me. 1986) ("[T]he paramount objective of the remedy is to make whole the victim of unlawful employment discrimination. Choice of remedy to accomplish that goal is vested in the sound discretion of the Superior Court." (citations omitted)); *Warren v. United Parcel Serv., Inc.*, 495 F. Supp. 2d 86, 88-89 (D. Me. 2007).

The Maine Supreme Judicial Court has not extensively discussed the contours of the reinstatement remedy.  There are differences between the MHRA and the Americans with Disabilities Act, and the Maine Law Court has ruled that the two acts are not always to be construed identically.  *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶ 15, 895 A.2d 309, 313. At the same time, the Law Court has stated:

> [T]he employment discrimination provisions in our statute were intended to be the
> state counterparts of the Federal Act, complementing and in certain instances
> supplementing the federal.  In such circumstances, decisions by federal courts
> interpreting the federal statutory equivalents of the Maine Act provide significant
> guidance in the construction of our statute.

*Maine Human Rights Comm'n v. United Paperworkers Int'l Union*, 383 A.2d 369, 375 (Me.

1978).   In the absence of detailed guidance from the Maine Supreme Judicial Court on

reinstatement as a remedy, the Court turns for guidance to First Circuit rulings on the federal

counterpart to the MHRA.

When an employee, who has been the victim of unlawful discrimination, seeks to return

to work, the "overarching preference is for reinstatement."  *Che v. Mass. Bay Transp. Auth.*, 342

F.3d 31, 43 (1st Cir. 2003) (*quoting Selgas v. American Airlines*, 104 F.3d 9, 13 (1st Cir. 1997));

*Harding,* 473 F. Supp. 2d at 95.   *Che* explained that "reinstatement is an important remedy

because it most efficiently advances the goals of [the anti-discrimination legislation] by making

plaintiffs whole while also deterring future discriminatory conduct by employers."   *Che*, 342

F.3d at 43 (internal punctuation and citation omitted).

The main alternative remedy is front pay; the First Circuit has stated that "[f]ront pay

should not be awarded unless reinstatement is impracticable or impossible."  *Colon v. Wal-Mart

Puerto Rico, Inc.*, 434 F.3d 75, 91 (1st Cir. 2006) (quoting *Johnson v. Spencer Press of Me., Inc.,*

364 F.3d 368, 380 (1st Cir. 2004)); *Rodriguez-Torres v. Caribbean Forms Mfg., Inc.*, 399 F.3d

52, 67 (1st Cir. 2005).   In listing the special considerations that could form the basis for a denial

of reinstatement, the courts have considered (1) the strength of the evidence, (2) if the plaintiff

found comparable employment, (3) property right over the position and (4) ineligibility for the

position.   *Che*, 342 F.3d at 43 n.1.   Recognizing that the reinstatement of an employee can

impose burdens on the employer and can result in workplace hostility against the returning

worker, the First Circuit has emphasized that "such burdens and hostility are not enough to justify a denial of reinstatement, absent special circumstances." *Che*, 342 F.3d at 43.

### 2.      Mr. Rooney's Claim for Reinstatement

#### a.      The Jury Verdict

Mr. Rooney asks to be reinstated to his position as a terminal operator at Sprague. He contends that the jury found that he was a qualified individual and that he could have performed the essential functions of his position with reasonable accommodations. Sprague vociferously disagrees. It says that Mr. Rooney "is not qualified and cannot perform his duties in a manner that would not endanger his safety or the safety of others . . . ." *Def.'s Op.* at 19.

The central flaw in Sprague's argument, no matter how strongly expressed, is that it is fact-based and the jury has issued a verdict against Sprague. The jury expressly decided that Mr. Rooney was a qualified individual.[2] *Special Verdict Form*. The Court instructed the jury that to find Mr. Rooney to be a "qualified individual," Mr. Rooney had to prove that "he could have performed the essential functions of the job at the time Sprague Energy placed him on leave if Sprague Energy had made reasonable accommodations for his disability." *Trial Tr.* 962:9-12. The Court defined "essential functions of a job," *Trial Tr.* 962:13-25; 963:1-24, and instructed the jury that Maine law requires "employers to provide reasonable accommodations to employees who are disabled unless allowing the employee to continue to work would endanger the health and safety of the employee or the health and safety of others or unless the accommodation would impose an undue hardship on the employer." *Trial Tr.* 964:8-13. The Court has already concluded that the jury found against Sprague on the Maine Safety Defense. *Order on Safety Defense*. In light of the jury verdict, Sprague's inveighing against reinstatement

---

[2] The jury also found that Sprague discriminated against Mr. Rooney with respect to the terms, conditions, or privileges of his employment and that Mr. Rooney's disability was a motivating factor in Sprague's decision to terminate him. *Special Verdict Form*.

rings hollow.  It cannot now be heard to make arguments to the Court that were rejected by the jury.  The verdict means that as of October 27, 2004, Mr. Rooney could have performed the job of terminal operator at Sprague without, or more likely with, reasonable accommodations, and that in doing so, he did not pose a danger to his or others' health and safety.

Sprague has more arrows in its quiver.  Regarding reinstatement, Sprague argues that even if Mr. Rooney was a qualified individual on October 27, 2004, when it placed him on a leave of absence, he is not now, because Sprague has changed the job description for the terminal operator position and there are now job duties Mr. Rooney cannot perform due to his disability. It also claims that the evidence establishes that Mr. Rooney's eyesight has deteriorated since October 27, 2004, and, even if he could have continued to work then, he cannot now.  Finally, turning to back pay, Sprague says that because Mr. Rooney has made no effort to find work, he has failed to mitigate his damages and his claim for back pay must be denied.

### b.      The October 2000 and December 2004 Job Descriptions

After Mr. Rooney was placed on leave of absence, Sprague changed the job description for the terminal operator position.  To assess the parties' respective positions, the first step is to analyze the two job descriptions and determine whether there are differences that justify a finding that although Mr. Rooney could perform the duties in the October 2000 job description, he would be unable to perform the current duties.  The earlier job description for terminal operator had been adopted in October 2000 and was in effect when Sprague placed Mr. Rooney on leave of absence. *Joint Ex.* 1.  The October 2000 job description contained the job duties for the Terminal Operator position without separate classes within the description and it stated that its purpose was to "provide a statement of the basic elements of the job." *Id.*  The job

description cautioned that it was "not intended to describe all the elements of the work that may be performed by every individual in this job." *Id.*

> The 2000 job description listed the following major duties and responsibilities:
>
> (1) operation of ticket booth; (2) night watchman responsibilities; (3) operation of large construction equipment (loader, bulldozer); (4) assist with mooring vessels; (5) assist with offloading of cargo (connecting hoses); (6) loading railroad cars; (7) operation of hoisting cranes; (8) operation of conveyor system; (9) supervise loading of caustic soda; (10) gauging of oil tanks; (11) assist with maintenance of grounds, buildings, and/or equipment; (12) participate in oil spill response drills; (13) operation of boiler (with suitable license as required); (14) electrical repairs (with suitable license as required); and, (15) welding (with suitable training/certification as required).

*Id.*  The job required a high school diploma or equivalent, a minimum of two years experience as a general laborer, knowledge of basic math, mechanical aptitude, licenses/certifications as required for some operations, basic computer knowledge, valid driver's license, good verbal and written communication skills, and physical activity/strength requirements, which it described as demanding.  *Id.*  A particular acuity of eyesight was not mentioned.

Mr. Rooney testified about what he actually did as an employee at Sprague.  He became a terminal operator in 1992.  *Trial Tr.* 51:11-12.  Working the 5:00 a.m. to 1:00 p.m. shift, Mr. Rooney's primary duty as a terminal operator was to operate the front-end loader to load road salt, gypsum, clinker (a product used in cement), and coal from piles in the Sprague yard and into dump trucks.  *Trial Tr.* 51:13-14; 51:18-25; 52:22-25; 53:1-14.  He ran the loader all day, usually eight hours.  *Trial Tr.* 55:16-19.

In addition, Mr. Rooney did other terminal operator job duties.  He worked in the warehouse; ran the ticket booth; filled in as night watchman; assisted in mooring vessels; connected hoses; ran the conveyor system while it was operational; supervised the loading of caustic soda; assisted with the maintenance of the grounds, buildings, and equipment; and

participated in oil response drills. *Trial Tr.* 58:5-25; 59:1-10; 60:3-25; 61:1-24; 65:25; 66:1-15; 67:13-20; 73:2-22. Mr. Rooney has a boiler operator's license and he performed that aspect of the terminal operator's job. *Trial Tr.* 80:14-24. There was also work in the job description he never did: running the bulldozer (Sprague leased the bulldozer and the lessor ran the equipment), loading railcars, running the hoisting cranes, and working as an electrician and welder. *Trial Tr.* 59:11-24; 67:24-25; 68:1-12; 69:22-24; 91:14-22. As of October 27, 2004, Mr. Rooney said some duties in the 2000 job description were obsolete, including running the hoisting cranes and the conveyor system, each of which Sprague had eliminated. *Trial Tr.* 70:15-25; 71:1. Finally, there were two duties in the 2000 job description that Mr. Rooney admitted he either could not do or preferred not to do as a consequence of his eyesight: supervising the loading of caustic soda and gauging oil tanks. *Trial Tr.* 73:17-22; 75:21-25; 76:1-2. Even though he preferred not to do it, Mr. Rooney continued to supervise the unloading of caustic soda until he was placed on leave. *Trial Tr.* 73:2-22. He never gauged oil tanks. *Trial Tr.* 73:23-25; 74:1-4; 75:21-25; 76:1-2.

To set the stage for the December 2004 job description, Duane Seekins explained the changes that have taken place at Sprague's Searsport Terminal since October 27, 2004. He testified that in 2005, Sprague added a 60,000 square foot warehouse, established a clay facility, and built a new guard house, and in 2006, it purchased the United States Government's tank farm, performing similar but expanded operations. *Evid. Hr'g, Seekins Test.* The number of employees at the Searsport Terminal has increased between 2004 to 2008 from twenty-eight to forty. *Evid. Hr'g, Seekins Test.* In addition, Frank Easton, Vice President of Human Resources for Sprague, testified that Sprague developed the December 2004 job description to "encourage cross-training so that terminal operators could cover all of the functions within their terminal."

*Trial Tr.* 637:7-10.  Also, Mr. Seekins explained that Sprague added a classification system within the terminal operator position to allow employees who obtain additional skills to advance. *Evid. Hr'g, Seekins Test.*

The December 2004 job description contains job duties for four classifications of terminal operator.  Class 4 terminal operator, the lowest classification, requires:

> (1) Weigh master license; (2) HAZWOPER 24 hr. certification at the next available Sprague HAZWOPER training session; (3) Attain the ability to gauge a product tank for inventory purposes; (4) Weight tickets, Automated Tickets, Manual Tickets; (5) Answering and directing incoming phone calls; (6) Basic understanding of security surveillance system; (7) Gate security duties; (8) Boiler Operator License; (9) The ability to back up liquid petroleum based product transfers.  This is specifically limited to a back up transfer paperwork and shall not include the physical active transfer duties.

*Joint Ex.* 3.  The functions of the Class 3 terminal operator are expressed in terms of goals, not duties; it requires the ability to perform all of the Class 4 duties plus:

> (1) Qualify to stand PIC; (2) Loading and offloading of oil rack/asphalt/caustic trucks; (3) Rack and customer assistance at primary location; (4) EOD [end of day] gauging and reconciliation; (5) General Rack Maintenance (Scully, Vapor hose, Sorrento, Etc.); (6) Proficiency at the active transfer of liquid petroleum based products; (7) Crane operation on bulk and break bulk vessel fork truck operation vessel and warehouse loader operation, Boiler Eng. IV Class.

*Id.*

Mr. Seekins testified that based on Mr. Rooney's restrictions, he could not perform two essential functions of the Class 4 terminal operator position:  tank gauging and backing up liquid petroleum based product transfers, which requires tank gauging.  *Evid. Hr'g, Seekins Test.*  Mr. Seekins also noted that the terminal operator position requires shift and overtime work, though he admitted that not all overtime was mandatory.  *Evid. Hr'g, Seekins Test.*  Mr. Seekins said that to be a Class 3 terminal operator, Mr. Rooney would have to be able to perform end of day gauging, usually at midnight.  *Evid. Hr'g, Seekins Test.*

Finally, on November 27, 2007, Mr. Rooney wrote Mr. Seekins and requested that Sprague make a series of accommodations to allow him to perform the essential functions of a terminal operator position.  *Pl.'s Ex.* 51-B, *Letter from Ashley Rooney to Duane Seekins* (Nov. 27, 2007).  The letter requested that Sprague make available some common pieces of equipment such as flashlights, two-way radios, and climbing harnesses, but also requested some alterations to the work site, such as extending the handrail on the stairway to the boiler room and installing side rails for railcar loading.  Mr. Rooney wrote that he thought he could "resume loader work, warehouse work, boiler work and work on the dry cargo hopper right away with the least amount of updated training and orientation."  *Id.* at 3.  He thought that with training, he could do patrol rounds.  *Id.*  He requested the assistance of a vocational rehabilitation person or occupational therapist to assist him to develop the skills necessary to safely perform the other job duties.  *Id.*

Sprague responds that Mr. Rooney "cannot perform each essential function of the job with or without reasonable accommodation, nor can he perform his job duties in a manner that will not endanger his safety or others."  *Def.'s Op.* at 17.  Sprague points out that Mr. Rooney could not pass the return to work physical examination because he does not have 20/40 corrected vision in both eyes.  *Id.*  It argues that gauging tanks is an essential function of the position of terminal operator and Mr. Rooney acknowledges he cannot gauge tanks, even with accommodation; thus, he cannot perform an essential function of the position.  *Id.* at 17-18.  Finally, Sprague notes that, since October 27, 2004, Mr. Rooney has developed cataracts, which further limit his vision, making it dangerous for him to perform many of the job duties at the Searsport Terminal.  *Id.* at 18-19.

### c.   Discussion – Reinstatement

Again, the jury verdict in this case constricts the Court's assessment of the facts. Significantly, the evidence establishes that up to the point when he was placed on leave of absence, Mr. Rooney had in fact been doing the job of terminal operator at Sprague. Sprague paid him to do the work and he worked largely without incident, even after he first began to experience vision problems in 2001 or early 2002.

To piece together what occurred in this case, it is especially revealing what Sprague said about Mr. Rooney and his job performance before late July 2004 and to track the events leading up to Sprague's job action. In June 2003, Mr. Seekins wrote out an extensive performance appraisal for Mr. Rooney. He gave Mr. Rooney a "3" rating, which corresponds with "[a]chieves major job objectives. Fully satisfactory in meeting job requirements." *Joint Ex.* 4 at 2. In his comments, he praised Mr. Rooney:

> Management Summary:   [Ashley Rooney] exceeds the requirements for the position, even on some of the most difficult and complex parts of the job. He knows the operations of the group and is ready to pitch in and take on extra tasks where needed. He is reliable, and once started on a task, he rarely needs prompting and can usually be depended upon to carry it through to completion. He is a solid performer who can be relied upon to use good judgment, pick a satisfactory approach, and proceed with few errors.

*Id.* These favorable comments were repeated verbatim on July 28, 2004, less than three months before he was placed on leave of absence. *Joint Ex.* 5 at 2.

Sprague's major contention is that Mr. Rooney could no longer work as a terminal operator because he could not gauge tanks. But, the evidence demonstrates that, even though Mr. Rooney worked at Sprague from 1983 to 2004, and as a terminal operator from 1992 to 2004, he never gauged a tank at Sprague. *Trial Tr.* 74:2-4. Although Mr. Seekins mentioned Mr. Rooney's failure to gauge tanks as a part of his performance appraisals in June 2003 and

14

July 2004, he did not include tank gauging as an area of "improvement opportunity" in either appraisal or as part of the major job objectives for the next evaluation period. *Joint Ex.* 4, 5. Instead, as Mr. Rooney testified, when Mr. Rooney told Mr. Seekins that he would do the tank gauging duties as soon as his eyes got better, Mr. Seekins asked Mr. Rooney to supply medical documentation for his request. *Trial Tr.* 100:23-25; 101:1.

Yet, on October 27, 2004, Sprague removed Mr. Rooney from its active workforce. Why?   On June 21, 2004, Mr. Rooney was examined by Dr. Linda Tyer to update his Department of Transportation (DOT) license.   To pass a DOT eye examination, a person must have 20/40 vision in both eyes.   When he was tested in late June 2004, Mr. Rooney could not meet the DOT requirements.   Shortly thereafter, Mr. Seekins became aware that Mr. Rooney had failed his DOT examination, but thought he only needed a new pair of glasses.   Mr. Rooney was allowed, however, to continue working and in fact received the favorable job appraisal in late July 2004.

What changed Mr. Rooney's position at Sprague was Dr. Flynn's October 15, 2004 letter. In that letter, which was addressed to Mr. Seekins, Dr. Flynn informed Sprague for the first time that Mr. Rooney had "macular degeneration, which affects his central vision." *Joint Ex.* 2.  He wrote that the vision in his right eye was 20/400 and 20/40 in his left eye.  *Id.*   Dr. Flynn explained that "[v]ision this different between the two eyes will severely impair Mr. Rooney's depth perception." *Id.*   He further explained that Mr. Rooney has "a lot of distortion in his right eye.   Straight lines will not be straight.   Climbing a ladder, as I believe he does at work, would be unsafe and very difficult to do." *Id.*   Dr. Flynn expressed the hope that his explanation "helps you in redefining his job duties." *Id.*

15

Mr. Seekins had no discussions with Mr. Rooney about the contents of the Flynn letter. Instead, Mr. Rooney testified that after Mr. Seekins received the Flynn letter, he "just came up and told me that he'd have to send me home." *Trial Tr.* 103:17-21. Sprague engaged in no discussions with Mr. Rooney. It simply took him off active duty. In these circumstances, the Court finds that Sprague's current claim that in order to perform the essential functions of the terminal operator position at Sprague, Mr. Rooney would have had to gauge tanks is wholly pretextual. Mr. Rooney actually performed the job of terminal operator without gauging tanks for about twelve years up to the date he was removed from his job. In fact, Mr. Rooney was actually in a front end loader performing his job duties when Mr. Seekins told him he had to leave the work site.

The only difference between Mr. Rooney in late July 2004, when he received a favorable job appraisal, and late October 2004, when he was placed on leave of absence, was that Sprague had received his diagnosis. To discriminate by diagnosis is flatly contrary to the MHRA. As the Maine Supreme Judicial Court explained twenty-five years ago, the employer must undertake an individualized assessment of the employee; it cannot take a job action based solely on a general diagnosis. *See Maine Human Rights Comm'n v. Canadian Pac., Ltd.*, 458 A.2d 1225 (Me. 1983).

Unfortunately, Sprague's job action against Mr. Rooney is consistent with its self-admitted treatment of its employees who have permanent disabilities. Sprague's attitude toward permanently disabled workers first came to light during the testimony of Nelson Walker, a liquid supervisor at Sprague. When asked whether he knew what the legal requirements were for accommodating individuals with disabilities, Mr. Walker replied: "Well, they're not supposed to have really any disability. Supposed to be a hundred percent to be able to work there, I know."

*Trial Tr.* 434:1-7.  Surprisingly, this statement does not appear to have been the misunderstanding of a low level supervisor.  Frank Easton, Sprague's Vice President of Human Resources, confirmed that "Sprague has made allowances for people who, because of their back or because of hip problems or because of this or that, might have six or eight weeks or three months where they couldn't do the normal function of the job, but after that period of time was up, they were expected to go back to their normal job."  *Trial Tr.* 664:1-7.  Sprague's practice of accommodating only those employees with temporary disabilities is illegal and contravenes the most basic precepts of the MHRA.

Mr. Rooney's case fits snugly within Sprague's improper practice.  Once Sprague learned Mr. Rooney had macular degeneration, it decided to remove him from its work force.  There is no evidence that Sprague engaged in any individualized assessment as to whether there were functions of the terminal operator job he could continue to perform.  Instead, based on his diagnosis alone, Sprague posited as a reason it could not continue to actively employ Mr. Rooney the fact he could not do one aspect of its job description – tank gauging – that he had never done and that it had never required him to do.

Finally, Sprague contends that Mr. Rooney's eyesight has deteriorated since October 27, 2004, and therefore, even if he was capable of performing the terminal operator work then, he cannot do so now.  Mr. Rooney himself testified that he did not believe his vision had gotten worse.  *Trial Tr.* 123:13-15.  His treating physician, Dr. Flynn, testified that when he first examined Mr. Rooney in October 2004, the corrected vision in his right eye was 20/400 and in his left eye was 20/40.  *Trial Tr.* 239:7-9, 14-16.  He also confirmed that at Mr. Rooney's last visit on October 10, 2007, his corrected right eye vision was 20/400 and his left eye was 20/40.[3]

---

[3] Relying on his recall, Dr. Flynn misremembered the results of the first examination in October 2004.  He testified that Mr. Rooney had "slipped a little bit.  He was at the low edge of 20/200 last - - or when I first saw him.  He is

17

*Trial Tr.* 274:14-21.  He opined that Mr. Rooney's better eye, the left eye, had done "amazingly well."  *Trial Tr.* 275:9-11.  At the same time, Dr. Flynn agreed that Mr. Rooney's vision had deteriorated since 2004.  *Trial Tr.* 297:15-17; 312:10-12.  Dr. Flynn acknowledged that Mr. Rooney has developed cataracts, which causes vision to become soapy and dim.  *Trial Tr.* 310:11-25; 311:1.  The degree to which Mr. Rooney's vision has deteriorated since 2004, however, was never quantified and Dr. Flynn's testimony is equivocal as to the extent of the deterioration.  Based on the evidence before it, the Court does not find that whatever change has occurred to Mr. Rooney's eyesight since 2004 justifies a denial of the remedy of reinstatement.

In these circumstances, consistent with the law's overarching preference for reinstatement, the Court orders Sprague to reinstate Mr. Rooney to his former job as terminal operator.  In doing so, Sprague must make an individualized assessment of Mr. Rooney's physical capacities, must compare his abilities with the essential requirements of the position of terminal operator, and must reasonably accommodate his disability.  In short, it must do now what it failed to do in October 2004.

**B.    Back Pay**

**1.    The Assertion of Total Disability and The Availability of a Back Pay Award**

This leaves the question of back pay.  Maine law authorizes back pay for victims of unlawful discrimination.  5 M.R.S.A. § 4613(2)(B)(2).  The Court rejects Sprague's contention that Mr. Rooney is so disabled that he should be considered ineligible for back pay.  In *Sullivan*, the First Circuit noted that where an employee has repeatedly claimed he was totally disabled, although such claims did not preclude an argument that he is capable of performing his job with reasonable accommodation, the employee "must explain why the representations of total

---

now 20/400, again, with some difficulty in the right eye."  *Trial Tr.* 274:14-19.  The October 2004 results were in fact identical to the last visit.  *Trial Tr.* 239:7-10, 14-16.

disability he has made in the past are consistent with his current claim that he could perform the essential functions of [his job] with reasonable accommodation." *Sullivan v. Raytheon Co.*, 262 F.3d 41, 47 (1st Cir. 2001); *Acevedo Martinez v. Coatings Inc.*, 286 F. Supp. 2d 107, 116-17 (D.P.R. 2003).

Here, Mr. Rooney has maintained from October 27, 2004 onward that he wished to continue to work at Sprague and could do so with reasonable accommodation. His successful application for Social Security disability benefits after Sprague removed him from its workplace does not alter his consistent willingness to return to work at Sprague nor does it eliminate his back pay claim against the employer who improperly refused to allow him to continue to work.

### 2.    The Failure to Mitigate Damages

Sprague's second contention is that because Mr. Rooney removed himself from the job market and failed to continue to look for work, he is not entitled under Maine law to back pay. Sprague points to the fact that since being placed on leave of absence, Mr. Rooney has failed to seek any work whatsoever, has applied for and received Social Security disability benefits, has not taken advantage of the Social Security Ticket to Work Program, and has generally acted in a manner consistent with early retirement. *Def.'s Op.* at 15-16. Sprague relies on general principles of Maine law that require an injured person to mitigate his damages and more specifically cites *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999), for the proposition that "when there is an utter failure on the part of a plaintiff to mitigate his damages, the plaintiff is precluded from seeking a back pay award." *Def.'s Op.* at 14-15.   In response, Mr. Rooney cites *Blockel v. J.C. Penney Co., Inc.*, 337 F.3d 17, 27 (1st Cir. 2003) and *Tobin v. Liberty Mut. Ins. Co.*, No. 01-11979 DPW, 2007 U.S. Dist. LEXIS 23680 (D. Mass. Mar. 29, 2007),

contending that the case law supports his view that by applying for disability benefits, he satisfied his obligation to mitigate his back pay damages.  *Pl.'s Reply* at 3-4.

   **a.**   **Legal Principles**

   As a starting point, the law requires an employer to compensate an employee for loss of back pay "between the time of the discharge and the trial court judgment."  *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 379 (1st Cir. 2004).  It is also true, however, that Mr. Rooney "was required to mitigate [his] damages to the extent possible."  *Blockel*, 337 F.3d at 27.  Under Maine law, a back pay award "as relief for unlawful employment discrimination is to be reduced by actual earnings on another job during the pertinent period or by whatever amount [the victim] could with reasonable diligence have earned during that time."  *Maine Human Rights Comm'n v. Dep't of Corrections*, 474 A.2d 860, 869 (Me. 1984) (internal punctuation and citation omitted).  However, the burden "is on the employer to prove facts to enable the court to determine the appropriate deduction."  *Id.*  To show that the plaintiff was not sufficiently diligent in pursuing other employment, the employer must do more than show that the plaintiff could have taken further actions in pursuit of employment: "the range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing [his] conduct."  *Webber v. Int'l Paper Co.*, 307 F. Supp. 2d 119, 126 (D. Me. 2004) (quoting *Maine Human Rights Comm'n*, 474 A.2d at 869)).  However, where the defendant shows that "the former employee made no effort to secure suitable employment," the defendant-employer is relieved of the "burden [of proving] the availability of substantially equivalent jobs in the relevant geographic area . . . ."  *Quint*, 172 F.3d at 16.

   At the same time, as *Blockel* observed, the employee was "entitled to recover what she would have been paid had she not become disabled, reduced by the amount of any disability

benefits." *Blockel*, 337 F.3d at 27. The First Circuit noted that the employee had "mitigated her damages by obtaining [her employer's] long-term disability and Social Security disability benefits." *Id.* at 28.

### b.    Application of Legal Principles to the Evidence

Sprague's final pitch is a change-up. Having staked its defense on Mr. Rooney's inability to work, Sprague now seeks to fault him for his failure to do so. Mr. Rooney responds in kind. Having contended that he could work full-time, Mr. Rooney seeks to justify his failure to do so. The twist in the mitigation arguments leads to counterintuitive positions. For example, during trial, Mr. Rooney objected vigorously to the admission of evidence of Sprague's benefit payments, but he now relies on evidence of his receipt of those payments to support his defense to the failure to mitigate argument. Similarly, during trial, Sprague strenuously argued that Mr. Rooney could not perform the terminal operator job, was significantly restricted from operating a motor vehicle, and was so disabled that it was justified placing him on leave of absence, but now asserts that he was not so disabled that he should not have sought and obtained work. Neither Mr. Rooney nor Sprague focused on the evidentiary requirements to support their respective positions on this issue, leaving the Court with a paucity of evidence with which to resolve certain significant issues.[4]

Several salient facts emerge. First, Mr. Rooney remains employed at Sprague. Unlike many failure to mitigate cases, where the employee was fired and free to work without repercussions from his former employer, Mr. Rooney was not fired from his job as a terminal operator; he was "sent home" until he got his eyes "straightened out." *Trial Tr.* 119:22-23. Mr. Rooney's supervisor, Duane Seekins, testified that after sending Mr. Rooney home from work,

---

[4] Neither party can claim surprise. In a pretrial ruling on a motion *in limine*, the Court detailed its view of the law on failure to mitigate. *See Rooney v. Sprague Energy Corp.*, 519 F. Supp. 2d 110, 127-28 (D. Me. 2007).

he continued to "hop[e] that Mr. Rooney would come back to work." *Trial Tr.* 704:16-17. Based on this belief that Mr. Rooney would return to work, Mr. Seekins hired an independent contractor to "fill[] in on a temporary basis" to cover for Mr. Rooney after he had lost his commercial driver's license, and Sprague has covered Mr. Rooney's commercial driving job duties in this manner through the time of trial. *Trial Tr.* 704:9-22. Mr. Rooney confirmed that he was still employed by Sprague. *Trial Tr.* 112:21-23 ("As far as I know, I'm still employed at Sprague."); 124:7-10, 13-14.

Mr. Rooney's status as a Sprague employee complicated his obligation to mitigate damages. It is unclear exactly what impact other employment would have had on his status as a Sprague employee, but it likely would have affected his right to continue to receive Sprague benefits. These benefits have included short-term and long-term disability and health coverage. *See Trial Tr.* 645:22-25; 646:1-25; 647:1-7. Mr. Easton testified that Sprague offers these benefits to its employees and that the benefits remain available until the employee is sixty-five years old, but only if the employee remains disabled. *Trial Tr.* 647:1-7. Mr. Easton made it clear that the disability benefits continued only for the period of disability. *Trial Tr.* 647:6-7. Language in the short-term and long-term disability documents supports the conclusion that if Mr. Rooney returned to full-time work for another employer, he would no longer be eligible for disability payments. *Def.'s Ex.* 59 BP-D at 1 (defining Short Term Disability as "a non-occupational illness or injury that incapacitates an active full time employee resulting in the inability to work . . . ."); *Def.'s Ex.* 60 BP-D at 68 (outlining the Guardian Disability Policy: "Your benefits from this *plan* will end on the earliest of the dates shown below: (d) After the *own occupation* period, the date you are able to perform the major duties of any *gainful work* on a full-time basis with reasonable accommodation that an employer is willing to provide."). Mr.

Easton testified that Sprague's continued provision of health insurance was limited to its employees on disability. *Trial Tr.* 646:21-25; 647:1-7.

In addition, there is no evidence that Mr. Rooney looked for work, other than suing Sprague to force it to allow him to return to work there.

Applying Maine law to these facts, the first question is whether Sprague has sustained its burden to prove that Mr. Rooney "could have mitigated [his] damages by finding other employment." *LeBlond v. Sentinel Serv.*, 635 A.2d 943, 945 (Me. 1993). Sprague did not produce evidence of what jobs would have been available to Mr. Rooney had he sought work.[5] *Quint*, 172 F.3d at 16. Instead, it relied upon Mr. Rooney's admission that he had done nothing to seek work at other employers since Sprague placed him on leave of absence. Mr. Rooney's concession places the case within the "mitigation-defense exception" the First Circuit has adopted in ADA cases. *Id.* The First Circuit explained that when a claimant "refrains from pursuing alternative employment, we consider it reasonable to presume at the outset that she did so for an articulable reason, perhaps because she possessed information which suggested that a job search would have been futile." *Id.* At the same time, the First Circuit noted that it is the "extraordinary case" in which a claimant's decision to withdraw from the job market can be found justifiable. *Id.* Maine law on this issue is similar to *Quint*. *See Maine Human Rights Comm'n*, 425 A.2d at 999 ("The equity court in formulating relief for unlawful discrimination under the Maine Act can well be guided by those federal and common law parallels.").

Mr. Rooney's first response is that he did not apply for other employment because he was still employed at Sprague. This explanation is not without merit. Mr. Rooney was not only

---

[5] During the evidentiary hearing, Sprague asked Mr. Rooney a hypothetical question about jobs listed in the Bangor Daily News, but this portion of the cross-examination extracted the concession that Mr. Rooney had not read the "Help Wanted" advertisements since he had been sent home from Sprague. The hypothetical questions were not later secured by an evidentiary foundation.

considered a Sprague employee, he was also paid ongoing benefits contingent upon remaining unable to work.  If he obtained full time employment with another employer, he would have jeopardized some, if not all, these benefits.  The Court is sympathetic to the legal dilemma Mr. Rooney faced.  After all, Sprague illegally discriminated against Mr. Rooney, ushered him off its premises, and yet kept him on as its employee and paid him employment-related benefits, and Mr. Rooney has sued Sprague to be reinstated to his position.  If Sprague had not taken its illegal actions or if Sprague had returned him to work voluntarily, Mr. Rooney would not have been required to seek work elsewhere.  Further, while Mr. Rooney's suit was pending, he had the right to hope that Sprague would ultimately be required to reinstate him.  In these circumstances, where the employee remains employed by the defendant and where the employee is seeking reinstatement as a remedy, to bar Mr. Rooney's back pay award, as Sprague urges, is unduly harsh.

By the same token, the law encourages individuals to mitigate damages and warrants a reduction in Mr. Rooney's back pay award by the amount he could have earned elsewhere.  The jury verdict establishes that as of October 27, 2004, Mr. Rooney could have worked full time as a terminal operator at Sprague, a finding the Court carries forward to today.  In view of that finding, it is difficult to conclude that no work would have been available to Mr. Rooney had he looked for it, and there is no evidence that Mr. Rooney took any action at all to comply with his work search obligations under *Quint* and by extension, under Maine law.

Mr. Rooney's second response is that his application for disability benefits to Sprague entirely fulfills his obligation to mitigate damages.  In *Blockel*, the First Circuit noted that an employee who had obtained long-term disability and Social Security disability benefits had "mitigated her damages."  *Blockel*, 337 F.3d at 28; *see Tobin*, 2007 U.S. Dist. LEXIS 23680, at

*26-31. The Court accepts the proposition that an application for disability benefits is evidence of the employee's effort to mitigate damages.

Here, Mr. Rooney mitigated Sprague's back pay obligation by applying to its long-term disability insurer and receiving $100 per month. Sprague is entitled to the $100 monthly credit against any back pay award, but the Court cannot find that merely by applying for and receiving $100 per month in disability benefits from Sprague, Mr. Rooney fulfilled his entire obligation to mitigate damages.[6] Again, the Court is constrained by the jury determination that as of October 27, 2004, Mr. Rooney could have performed a full-time job as a terminal operator compounded by the Court's determination that he can do so today. In sum, the Court finds that Mr. Rooney partially mitigated his damages by applying for and receiving disability benefits from Sprague; however, he did not fully do so.

### 3. Calculation of the Back Pay Award

Finally, under Maine law, an employer bears the burden to establish the appropriate deduction – what the employee could have earned with reasonable diligence had he returned to work at another job. *Maine Human Rights Comm'n*, 474 A.2d at 869; *Maine Human Rights Comm'n v. City of Auburn*, 425 A.2d 990, 999 (Me. 1981). The record is silent on this issue. Nevertheless, the jury found that Mr. Rooney could have worked full-time as of October 27, 2004, and the Court finds that he can do so today, and that Mr. Rooney's eyesight has not significantly changed since October 27, 2004. Guided by these findings, the Court finds that Mr. Rooney was capable of working forty hours per week at other employment during the period from October 27, 2004 to the present.

---

[6] A different argument could be made about short-term disability benefits, but it would make no difference. The short-term disability benefits exceeded what the Court finds Mr. Rooney could have earned during the same interval, therefore, the short-term disability benefits have been subtracted from the award of back pay.

No evidence was submitted regarding the amount Mr. Rooney could have earned on an hourly or weekly basis.[7] Accordingly, the Court uses Maine's minimum wage to reflect the least amount Mr. Rooney could have earned on an hourly basis. Maine's minimum wage from October 27, 2004 to the present has been: $6.35 until October 1, 2005; $6.50 until October 1, 2006; $6.75 until October 1, 2007; and, $7.00 to the present.[8] At forty hours per week, Mr. Rooney would have received $254 weekly from October 27, 2004 to October 1, 2005; $260 from October 1, 2005 to October 1, 2006; $270 from October 1, 2006 to October 1, 2007; and, $280 from October 1, 2007 to date. The Court finds that with reasonable diligence, Mr. Rooney could have earned these weekly amounts from October 27, 2004 to date.

Reducing Mr. Rooney's back pay claim from October 28, 2004, by the amount of his short-term and long-term disability benefits and by what he could have earned during that interval (whichever is greater), the total is $84,765.03.[9] It is this amount the Court orders.

## C.    Front Pay

Since the Court orders reinstatement, to mandate front pay is inappropriate. *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 67 (1st Cir. 2005); *Harding*, 473 F. Supp. 2d at 95. However, Mr. Rooney should not suffer a loss of income during the gap between this order and his actual return to work. *See Harding v. Cianbro Corp.*, 498 F. Supp. 2d 337, 342 (D. Me. 2007). To encourage the parties, specifically Sprague, to expedite Mr. Rooney's

---

[7] Although Mr. Rooney might have been able to earn more during this interval, the burden to establish his earning capacity rests with Sprague and it produced no evidence at all on this issue. Therefore, the Maine state minimum wage is used as a default earning capacity figure.

[8] Minimum Wage Information, Maine Department of Labor, http://maine.gov/labor/labor_laws/minwagehistory.html (last visited June 23, 2008).

[9] The parties agree that Sprague was entitled to a credit for the disability payments it made to Mr. Rooney. Sprague's short-term disability program paid a weekly benefit in excess of $254.00, the weekly amount Mr. Rooney could have earned at minimum wage at the time he was receiving the benefit; therefore, Sprague is credited the short-term disability benefit only until April 25, 2005, when the short-term disability program was transitioned to the long-term disability program. From April 25, 2005 to date, Mr. Rooney has received $100 per month in long-term disability payments. During this interval, the amount he could have earned working forty hours per week at minimum wage exceeded his long-term disability benefit. Therefore, the calculation of back pay during that period is reduced only by his assumed weekly wages for full-time work at minimum wage.

reinstatement and to make certain that he is compensated during the hiatus between this Order and his return to work, the Court orders Sprague to pay an award of front pay equal to a weekly award of $463.35 from the date of this Order to the date Sprague reinstates Mr. Rooney.

### D.     Prejudgment Interest

Whether to award prejudgment interest on a federal claim is a jury question.  *Currier v. United Tech. Corp.*, 326 F. Supp. 2d 145, 158 (D. Me. 2004).    However, here, Mr. Rooney elected to proceed solely on the Maine statutory claim.  Under Maine law, prejudgment interest accrues from the date of the filing of the complaint to the date of judgment at a rate equal to the weekly average one-year constant maturity Treasury yield plus 3%.[10]  14 M.R.S.A. § 1602-B(3)(A), (5).  Although Mr. Rooney has not asked for prejudgment interest on the punitive damages award, Sprague correctly notes that he would not be entitled to it.  *Moholland v. Empire Fire & Marine Ins. Co.*, 2000 ME 26, ¶ 4, 746 A.2d 362, 364 (stating that "prejudgment interest is a species of compensatory damages"); *Harding*, 473 F. Supp. 2d at 100 n.16.  Therefore, prejudgment interest is due from the date of the filing of the complaint to the date that the Court enters judgment on the back pay and compensatory damages award.

## III.    CONCLUSION

The Court ORDERS Sprague to: (1) reinstate Mr. Rooney to his former job as a terminal operator; (2) pay Mr. Rooney $84,765.03 in back pay; (3) pay an award of front pay equal to a weekly award of $463.35 from the date of this Order to the date Sprague reinstates Mr. Rooney;

---

[10] The Maine statute provides that prejudgment interest shall be suspended if the prevailing party obtains a continuance in excess of thirty days.  14 M.R.S.A. § 1602-B(5).  Neither party mentioned this provision, but the Court reviewed its docket and has concluded it does not apply.

and, (4) pay prejudgment interest on the compensatory and back pay damages awards as outlined in this order.[11]

        SO ORDERED.

                                        /s/ John A. Woodcock, Jr.
                                        JOHN A. WOODCOCK, JR.
                                        UNITED STATES DISTRICT JUDGE

Dated this 24th day of June, 2008

---

[11] Mr. Rooney requests two additional forms of relief:  reimbursement for the cost of renewing his boiler license, in the amount of $150, and an order mandating the services of an occupational therapist to assist his reinstatement. Even if the Court has the authority to issue an order requiring Sprague to reimburse Mr. Rooney for a professional license and to hire an occupational therapist, it declines to do so in this case.