UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ASHLEY ROONEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-06-20-B-W |
| | ) | |
| SPRAGUE ENERGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S POST-TRIAL MOTIONS**

Shortly after Ashley Rooney, a twenty-year employee of Sprague Energy Corp. (Sprague), informed his employer that he had been diagnosed with macular degeneration, Sprague placed him on an indefinite leave of absence.  Mr. Rooney filed suit, claiming that Sprague illegally discriminated against him because of his disability.  On October 30, 2007, a jury found that Sprague had discriminated against him in violation of the Maine Human Rights Act (MHRA) and awarded him $300,000 in compensatory damages and $150,000 in punitive damages; on June 26, 2008, the Court issued an Amended Order on Equitable Remedies and ordered payment of back pay, Mr. Rooney's reinstatement, and front pay until then; and, on July 2, 2008, the Court entered an Amended Judgment in favor of Mr. Rooney.  On July 3, 2008, Sprague filed a Motion for Reconsideration of the Amended Order on Equitable Remedies, and on July 7, 2008, Sprague filed three post-trial motions:  a Motion for Judgment as a Matter of Law, a Motion for Remittitur of Damages, and a Motion for a New Trial.  The Court denies each.

## I.      STATEMENT OF FACTS

### A.      Procedural History

After the verdict, Sprague moved for a judicial finding on the Maine safety defense, claiming the issue had not been presented to the jury.  *Def.'s Mot. for the Court's Finding on the Issue of Safety* (Docket # 151).  The Court denied the motion.  *Order Denying Def.'s Mot. for the Court's Finding on the Issue of Safety* (Docket # 165) (*Order on Safety Mot.*).  As issues of back pay, front pay, and reinstatement are reserved for Court determination, the Court held an evidentiary hearing on January 16, 2008, (Docket # 157), and subsequently issued an order on the issues of back pay, front pay, and reinstatement.  *Am. Order on Equitable Remedies* (Docket # 170) (*Order*).  Sprague has filed four additional post-trial motions.  *Def.'s Mot. for Recons.* (Docket # 175); *Def.'s Mot. for J. as a Matter of Law* (Docket # 176) (*Def.'s Mot. for J.*); *Def.'s Mot. for Remittitur of Damages* (Docket # 177) (*Def.'s Mot. for Rem.*); *Def.'s Mot. for New Trial* (Docket # 178).

Mr. Rooney responded.  *Pl.'s Mem. of Law in Opp'n to Mot. for Recons.* (Docket # 180) (*Pl.'s Resp. – Mot. for Recons.*); *Pl.'s Mem. of Law in Opp'n to Mot. for J. as a Matter of Law* (Docket # 181) (*Pl.'s Resp. – Mot. for J.*); *Pl.'s Mem. of Law in Opp'n to Mot. for New Trial* (Docket # 182) (*Pl.'s Resp. – Mot. for New Tr.*); *Pl.'s Mem. of Law in Opp'n to Mot. for Remittitur of Damages* (Docket # 183) (*Pl.'s Resp. – Mot. for Rem.*).  Sprague replied.  *Reply Mem. of Law in Supp. of Mot. for Recons.* (Docket # 188) (*Def.'s Reply – Mot. for Recons.*); *Reply Mem. of Law in Supp. of Mot. for J. as a Matter of Law* (Docket # 189) (*Def.'s Reply – Mot. for J.*); *Reply Mem. of Law in Supp. of Mot. for Remittitur of Damages* (Docket # 190) (*Def.'s Reply – Mot. for Rem.*); *Reply Mem. of Law in Supp. of Mot. for New Trial* (Docket # 191) (*Def.'s Reply – Mot. for New Tr.*).

### B.      The Evidence in the Light Most Favorable to the Verdict

Sprague maintains a tenacious opposition to Mr. Rooney's claim.  Nevertheless, the evidence viewed in a light most favorable to Mr. Rooney reveals that Sprague engaged in a

disquieting sequence of discriminatory actions:  Mr. Rooney had been employed by Sprague for two decades, had received generally favorable job evaluations, and had been able to perform his job until October 27, 2004, when Sprague pulled him out of the cab of the front-end loader he was operating and placed him on long-term leave.  Sprague put Mr. Rooney off work within two weeks of receiving word that Mr. Rooney had been diagnosed with the medical condition of macular degeneration, even though he had been performing his job without significant incident. The triggering factor for Sprague's action against him was the diagnosis alone.  Before placing Mr. Rooney off work, Sprague made no effort to match the job requirements with his limitations, failed to communicate with his physician, and did not investigate possible accommodations.

Sprague's actions were consistent with its company policy of actively discriminating against employees with long-term disabilities.  If an employee were temporarily injured or disabled, Sprague would allow them time to recover and to return to their job, but if the employee was not 100%, Sprague would put them out of work on long-term disability. Sprague's manifestly illegal policy was confirmed by more than one Sprague witness, including its Vice President of Human Resources.

Not surprisingly, in view of this evidence, the jury found that Sprague violated the MHRA by discriminating against Mr. Rooney because of his disability.  Sprague filed multiple motions challenging the wisdom and legality of the jury verdict and the Court's Order on Equitable Remedies.  This latest barrage of motions reiterates many positions the Court previously addressed at length and rejected.  The Court concludes that none of the motions is meritorious.

## II.      DISCUSSION

### A.      Motion for Reconsideration

#### 1.      Legal Standards

Sprague carries a heavy burden in its motion for reconsideration.  To succeed, Sprague must "demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law."  *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006); *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 25 (1st Cir. 2007) ("As a general matter, a motion for reconsideration may only be granted if the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations."); *see* D. Me. Loc. R. 7(g) ("A motion to reconsider an interlocutory order of the court, meaning a motion other than one governed by Fed. R. Civ. P. 59 or 60, shall demonstrate that the order was based on a manifest error of fact or law . . . .").  Sprague makes no claim of newly discovered evidence and, therefore, must demonstrate that the Court's Amended Order on Equitable Remedies contained a "manifest error of fact or law."

#### 2.      Back Pay

Sprague raises a number of claims of error in the Court's award of back pay to Mr. Rooney:  (1) that if Mr. Rooney has work capacity, he is not entitled to a back pay award because he failed to mitigate his damages; (2) that if he is totally disabled, he is not entitled to a back pay award, because he cannot physically work; (3) that his receipt of insurance benefits does not justify an award of back pay benefits; (4) that a back pay award violates significant public policy; and, (5) that if any back pay is awarded, it must be limited to a period not to

exceed ninety days after Sprague's implementation of the December 2004 Terminal Operator job description.

Curiously, in its motion for reconsideration, Sprague asks the Court to reconsider many matters on which it prevailed. Sprague urges the Court to reconsider its ruling on Mr. Rooney's failure to mitigate damages, but the Court concluded that Mr. Rooney had failed to fully mitigate his damages. Sprague urges the Court to reconsider whether Mr. Rooney was totally disabled, but the Court concluded that Mr. Rooney was not totally disabled. Sprague urges the Court to reconsider whether Mr. Rooney's receipt of insurance benefits justifies his failure to look for work, but the Court concluded that Mr. Rooney's receipt of insurance benefits did not justify his failure to look for work. Sprague's motion for reconsideration thus appears to be largely reflexive.

Sprague insists that the Court should not have ordered any back pay at all. Here, the Court and Sprague simply disagree. Sprague prefers what the Court views as a draconian equitable remedy: because Mr. Rooney failed to seek other work, he must forfeit any back pay award from the employer from whom he is seeking work. In this instance, where the employer discriminated against the employee, where the employee remained employed by the employer, and where the employee has been consistently seeking to be reinstated to his former job, the Court concluded that to absolve Sprague of any back pay responsibility was inequitable.

Accordingly, the Court framed a remedy that reduced Mr. Rooney's back pay claim by an amount he could have earned had he sought and obtained employment elsewhere. But, the Court was limited by Sprague's own failure: a total absence of labor market evidence. Sprague presented no evidence as to "what the employee could have earned with reasonable diligence had he returned to work at another job." *Order* at 25 (citing *Me. Human Rights Comm'n v. Dep't of*

*Corr.*, 474 A.2d 860, 869 (Me. 1984); *Me. Human Rights Comm'n v. City of Auburn*, 425 A.2d 990, 999 (Me. 1981)).   The Court filled in Sprague's evidentiary omission by using Maine's minimum wage as an incontrovertible proxy for what Mr. Rooney could have earned.   If Sprague had presented some evidence from which the Court could have concluded that Mr. Rooney could have earned more than minimum wage, Sprague's back pay responsibility might have been reduced, depending on the quality of that evidence.   But, as the record on this issue is entirely silent, Sprague now complains about the Court's efforts to fill an evidentiary hole that Sprague left empty.

There is language in *Quint* suggesting that a failure to look for suitable work may bar a back pay award.   *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999).   There is also language in *Blockel* suggesting that the receipt of long-term disability and Social Security disability benefits may satisfy the employee's duty to mitigate.   *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 28 (1st Cir. 2003).   The Court does not view either *Quint* or *Blockel* as mandating a particular result.   Instead, the Court charted a middle course, one consistent with the law's requirement that the employee be made whole for the loss he sustained as a result of the employer's illegal discrimination and at the same time consistent with the employee's obligation to mitigate the damage the employer has caused.   *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 379 (1st Cir. 2004); 5 M.R.S.A. § 4613(2)(B)(2).   Sprague has failed to demonstrate that the Court's remedy contained a manifest error of fact or law.

### 3.     The 2004 Job Description and the Back Pay Award

#### a.     Sprague's Contention

The Court separately addresses Sprague's fifth contention:   that any award of back pay "should be limited to the time period ending no later than April 1, 2005, said period being at least

90 days subsequent to Sprague's implementation of the December 2004 Terminal Operator job description." *Def.'s Mot. for Recons.* at 4.  Sprague maintains that the 2004 Terminal Operator job description requires all terminal operators be able to "perform the essential function of tank gauging" within ninety days. *Id.*  Since Mr. Rooney acknowledges that he cannot gauge tanks, Sprague asserts the back pay award "must be limited to ninety days from implementation of the new job description.  After ninety days, Plaintiff is no longer eligible to retain the job of Terminal Operator." *Id.*

The December 2004 job description contains job duties for four classifications of terminal operator; a Class Four terminal operator, the lowest classification, must "[a]ttain the ability to gauge a product tank for inventory purposes." *Joint Ex.* 3.  In addition, the job description establishes a ninety-day probationary period, during which a terminal operator must demonstrate "[a] working knowledge and understanding of Sprague Standard Operating Procedures." *Id.*  Duane Seekins, the terminal manager for Sprague, testified that if an employee does not learn to perform the various required duties, they will not keep their job. *Trial Tr.* 708:2-6.  Sprague states that the Court is not bound by the jury's verdict on this issue of a ninety-day limitation because "with respect to the definition of qualified individual, the jury was expressly instructed only that Rooney must prove that he could have performed *the essential functions of the job at the time Sprague Energy placed him on leave* if Sprague Energy had made reasonable accommodations for his disability." *Def.'s Mot. for Recons.* at 5 (citation and quotation omitted).  As the 2004 Terminal Operator Job Description became effective at the Searsport Terminal sometime in December 2004, and Mr. Rooney was placed on leave in October 2004, Sprague argues that "[t]he Court cannot be bound by a finding the jury did not and could not possibly have made." *Def.'s Reply – Mot. for Recons.* at 1.

### b.    A Flawed Premise

Sprague's argument is grounded on the flawed premise that the Court is required to accept Sprague's December 2004 job description as setting forth the essential functions of Mr. Rooney's terminal operator position.  Maine law prohibits an employer from discriminating "against a qualified individual on the basis of a physical . . . disability."  *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48, 53.  Under Maine law, to sustain his burden of proof against Sprague before the jury, Mr. Rooney was required to demonstrate that "first, [he] suffers from a disability; second, [he] is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, [he] was adversely treated by the employer based in whole or in part on [his] disability."  *Id.*  In this case, there is no question that Mr. Rooney met the first and third criteria.  The battle was over the second criterion.

To arrive at its verdict, the jury had to conclude that contrary to the then-existing job description, Mr. Rooney was able to perform the essential functions of his position with or without accommodation as of October 27, 2004, a conclusion soundly based on the evidence at trial.  Mr. Rooney had actually been performing his job as a terminal operator since 1992; he testified that he operated a front-end loader eight hours a day for years and occasionally he did other terminal operator duties.  Significantly, however, Mr. Rooney also testified that he had never performed some of the job duties listed in the Sprague terminal operator job description.  The jury verdict in this case is consistent with a finding that Sprague's job description for the terminal operator position as of October 27, 2004 was a description in name only and that the real job description for Mr. Rooney's job was what he actually did, not what a Sprague document said a terminal operator was supposed to do.  Moreover, the jury did not merely reject Sprague's defense; it did so emphatically, imposing punitive damages equal to half the amount of the compensatory damages.

This same analysis applies to the December 2004 job description.  The Court acknowledges that the essential functions may be established by (1) the employer's judgment as to which functions

are essential; (2) written job descriptions; (3) the amount of time spent performing the function; (4) the consequences of not requiring the incumbent to perform the function; and, (5) the current work experience of incumbents in similar jobs. *Def.'s Mot. for J.* at 2-3 (citing 29 C.F.R. § 1630.2(n)(3)). Also, the "'employer's judgment in this regard is considered highly probative.'" *Id.* at 3 (quoting *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004)); *see Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002) (stating that in "deciding whether a specific job function is essential or marginal, courts must pay heed to the employer's judgment as to what functions of a job are essential") (quotation omitted). However, "the employer's good-faith view of what a job entails, though important, is not dispositive." *Gillen*, 283 F.3d at 25.

Here, the Court cannot find that Sprague's view of what the job entails was in good faith, and in the context of this case, Sprague's insistence that, unlike its old job description, its new job description actually does set forth the essential functions of the terminal operator position is unconvincing. In sum, the Court expressly rejects Sprague's contention that the December 2004 job description constituted an accurate description of essential job duties for Mr. Rooney's position at Sprague and concludes that Sprague failed to demonstrate the earlier Order contained a manifest error of law or fact.

### 4.    Reinstatement

When an employee, who has been the victim of unlawful discrimination, seeks to return to work, the "'overarching preference is for reinstatement.'" *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 43 (1st Cir. 2003) (quoting *Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 13 (1st Cir. 1997)). Objecting to Mr. Rooney's reinstatement, Sprague continues to argue that Mr. Rooney:

> [C]annot *safely* perform the essential functions of the Terminal Operator job because he does not have minimum vision requirements for the reasons previously cited; he cannot pass a return to work physical which requires combined vision in both eyes of 20/40; and his condition has not only "retrogressed," he has developed the additional condition of cataracts.

*Def.'s Mot. for Recons.* at 4-5 (emphasis in original) (citation omitted).  Sprague contends that Mr. Rooney is no longer eligible to work as a Terminal Operator, and reinstatement must be denied.  *Id.* at 6.

At trial, Frank Easton, Sprague's Vice President for Human Resources, testified that Sprague has a policy requiring 20/40 corrected vision in both eyes.  *Trial Tr.* 655:23-25; 656:1-7; 660:4-6.  The First Circuit has recognized that there are certain "'special considerations'" that could serve as legitimate reasons for a denial of reinstatement; one such consideration is "'the ineligibility of the employee for the position, due to failure to meet established qualifications, which would permit immediate discharge for no reason or for any permissible reason.'"  *Che*, 342 F.3d at 43 n.1 (quoting *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 429 (1st Cir. 1993)).  The First Circuit has found that "where it appears that there is a strong possibility that a particular employee remains ineligible for appointment and therefore would be subject to nondiscriminatory termination, some courts consider reinstatement a disfavored remedy."  *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 14 (1st Cir. 1991).  However, the *Hiraldo-Cancel* court also found that "even in such straitened circumstances, the trial court, not this court, bears the principal responsibility for assessing the efficacy of the equitable remedy in the particular case."  *Id.*

The Court considered and rejected Sprague's argument that Mr. Rooney cannot now perform the terminal operator job duties; based on the evidence during both the jury and bench trial phases, the Court found that Mr. Rooney is able to perform the job of terminal operator.

Sprague's restated objection does not provide a basis for altering the earlier analysis. There being no manifest error of law or fact, the Court affirms its reinstatement order.[1]

### 5.      Front Pay

The First Circuit has noted that front pay "is money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement [and] . . . thus compensates plaintiffs for lost wages that may accrue after the conclusion of the trial." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 379 (1st Cir. 2004) (citation and quotation omitted). Sprague argues front pay "is an alternative to reinstatement and it is intended to be temporary in nature. An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing." *Def.'s Mot. for Recons.* at 6 (quotation omitted). Ironically, however, Sprague controls the term of the front pay remedy to which it now objects. The Court expressly ordered that the front pay remedy cease on "the date Sprague reinstates Mr. Rooney." *Order* at 27. The moment Sprague complies with the reinstatement order, its exposure under the front pay remedy is capped. Thus, the Court included the award of front pay "to expedite Mr. Rooney's reinstatement" and to prevent Mr. Rooney from suffering "a loss of income during the gap between [its] order and his actual return to work." *Order* at 26-27.

Sprague has not yet complied with the Court's June 26, 2008 reinstatement order. Sprague's failure to reinstate Mr. Rooney, despite the encouragement of a temporary front pay remedy, tends to confirm the wisdom of the front pay order. Sprague's intransigence in the face of a strong and growing financial incentive to satisfy its legal obligations leaves no illusions about whether Sprague would have complied with the reinstatement order, absent such an incentive. The purpose of the Court's equitable remedy was to make Mr. Rooney whole. *See*

---

[1] The Court previously addressed the condition of Mr. Rooney's eyesight from the time he was sent home to the present. *See Order* at 17-18. It refers to and incorporates the reasoning of its Order dated June 26, 2008, in this ruling.

*Rozanski v. A-P-A Transp., Inc.*, 512 A.2d 335, 342 (Me. 1986) ("[T]he paramount objective of the remedy is to make whole the victim of unlawful employment discrimination. Choice of the remedy to accomplish that goal is vested in the sound discretion of the [trial] Court."). The time-limited award of front pay compensates Mr. Rooney for the ever-growing gap between judgment and the day he is reinstated to his job.[2] Sprague has failed to demonstrate a manifest error of law or fact.

### B.      Motion for Judgment as a Matter of Law

#### 1.      Legal Standards

Sprague also submits a renewed motion for judgment as a matter of law. In general, once a party has been fully heard on an issue at trial,

> and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). In this case, the Court denied Sprague's motion for judgment as a matter of law under rule 50(a), and submitted the case to the jury. Sprague filed a renewed motion under rule 50(b), challenging the jury's finding that Mr. Rooney is a qualified individual, and reasserting the Maine safety defense.

The standard of review for motions for judgment as a matter of law requires the Court "to view the evidence 'in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.'" *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quoting *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429,

---

[2] In the context of the front pay award, Sprague again presents the 2004 Terminal Operator Job Description and argues that any award of front pay should be limited by the ninety-day probationary period because Mr. Rooney cannot gauge tanks. *Def.'s Mot. for Recons.* at 6-7. For the reasons stated in this Order and in its Order dated June 26, 2008 the Court finds that the 2004 job description does not elevate the task of gauging tanks to the level of an essential function of the terminal operator job.

436 (1st Cir. 1997)).  A jury verdict should not be set aside as a matter of law "unless there was only one conclusion the jury could have reached." *Id.* (citing *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987)).  Specifically, the Court's review "is weighted toward preservation of the jury verdict"; the Court will uphold the jury verdict "unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]." *Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 41-42 (1st Cir. 2002) (internal quotation omitted).

### 2.    *Phelps v. Optima Health, Inc.*

The ongoing debate concerning whether Mr. Rooney was a qualified individual can be reduced to whether gauging tanks is an essential function of the terminal operator job.[3]  Sprague notes that if a plaintiff, "with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate." *Calef v. Gillette Co.*, 322 F.3d 75, 86 n.8 (1st Cir. 2003).  Sprague points to *Phelps v. Optima Health*, in which the First Circuit wrote that "even when an employer and employee have made arrangements to account for the employee's disability[,] a court must evaluate the essential functions of the job without considering the effect of the special arrangements." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25 (1st Cir. 2001).  In *Phelps*, the Court found that "the ability to lift fifty pounds was an essential function of the position held by Phelps at the time of her termination" from her job as a nurse. *Id.* at 26.  That other nurses assumed Ms. Phelps' lifting tasks did not change the fact that the ability to lift fifty pounds was an essential function of the

---

[3] In addition to gauging tanks, Sprague argues that supervising the loading of caustic soda is an essential function of the terminal operator job that Mr. Rooney cannot perform. *Def.'s Mot. for J.* at 5-6.  Mr. Rooney testified that he stopped working around caustic soda prior to being sent home from his job. *Trial Tr.* 158:12-22.  He also testified that he believed he could supervise the loading of caustic soda. *Trial Tr.* 159:6-8.  Viewing this evidence in the light most favorable to the nonmoving party, the Court concludes that Mr. Rooney is able to perform this portion of the terminal operator job.

job.  *Id.*  *Phelps* stated "evidence that accommodations were made so that an employee could avoid a particular task 'merely shows the job could be restructured, not that [the function] was non-essential.'"  *Id.* (quoting *Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001)) (alteration in original).  The court reasoned that to find otherwise "would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers." *Id.*

*Phelps* does not apply to the facts in this case, when viewed in the light most favorable to Mr. Rooney.  Sprague did not excuse Mr. Rooney from tank gauging because he had macular degeneration; it was unaware he had the eye condition until a few weeks before it suddenly terminated him and according to Mr. Rooney, he had never done tank gauging during his two decades of employment at Sprague.  The Court instructed the jury in a manner consistent with *Phelps* and the jury verdict is consistent with its rejection of Sprague's *Phelps* defense.[4]

### 3.    Tank Gauging

Returning to whether Mr. Rooney was a qualified individual, the critical issue is whether tank gauging is an essential function of the terminal operator job.[5]  The jury found that Mr.

---

[4] *Phelps* was discussed at length during the preparation of the final jury instructions.  *See Trial Tr.* 831:1-25, 832:1-12; 890:21-25, 891:1-25, 892:1-19.  Sprague also cited *Phelps* during its Rule 50(a) motion.  *Trial Tr.* 952:3-11.  The Court instructed the jury based on *Phelps*:

> You must evaluate the essential functions of the job without considering the effect of any special arrangements Sprague Energy may have made for Mr. Rooney in the past.  The fact that an employee might only be assigned to certain aspects of the multitasked job does not necessarily mean that those tasks to which he was not assigned are not essential.  Evidence of special arrangements, however, may be considered to determine whether the job could be restructured, but not whether the function itself was not essential.

*Trial Tr.* 963:15-24.

[5] Nelson Walker, an employee at Sprague for over thirty years, testified that employees are "not supposed to have really any disability.  Supposed to be a hundred percent to be able to work there I know."  *Trial Tr.* 434:5-7.  Based on this testimony, the Court instructed the jury:

> The law requires employers to make reasonable accommodations for employees with disabilities.  If you find that Sprague Energy had a policy or practice that only persons who were 100-percent fit could work and that such a policy was applied to Mr. Rooney in placing him on leave, then you should find for Mr. Rooney on his claim, because having and applying such a policy is a per se violation of the law.

*Trial Tr.* 965:2-8.  This 100-percent rule is an alternate basis for the jury to have found in favor of Mr. Rooney.

Rooney was a qualified individual, meaning he could perform all of the essential functions of the terminal operator job with or without reasonable accommodation. *Special Verdict Form* (Docket # 133). Sprague asserts "[t]he unanimous, undisputed trial evidence . . . is so strongly and overwhelmingly inconsistent with the verdict that no fair minded or reasonable jury could have so found." *Def.'s Reply – Mot. for J.* at 4. Sprague's argument that gauging tanks is an essential function is based on the 2000 job description; the testimony of Messrs. Seekins, Russell, and Easton; and Mr. Rooney's testimony. Setting aside for a moment Mr. Rooney's testimony, the 2000 job description and the testimony of the three Sprague employees collectively constitute the employer's view of the terminal operator position. In general, substantial weight is given "to the employer's view of job requirements in the absence of evidence of discriminatory animus, [but] it is only one factor in the analysis." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000) (citation omitted).

Running counter to the employer's position is Mr. Rooney's testimony that he never gauged tanks. *Trial Tr.* 74:2-4. This is a significant: "Inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." *Benson v. Nw. Airlines*, 62 F.3d 1108, 1113 (8th Cir. 1995) (quoting *Americans with Disabilities: Practice and Compliance Manual* § 7:42 (George L. Bounds et al., eds., 1995)). Consistent with Mr. Rooney's testimony are his performance appraisals prepared by Mr. Seekins in June 2003 and July 2004. In June 2003, Mr. Seekins gave Mr. Rooney a "3" rating, which corresponds with "[a]chieves major job objectives. Fully satisfactory in meeting job requirements." *Joint Ex.* 4 at 2. In his comments, Mr. Seekins praised Mr. Rooney:

> Management Summary: [Ashley Rooney] exceeds the requirements for the position, even on some of the most difficult and complex parts of the job. He

> knows the operations of the group and is ready to pitch in and take on extra tasks where needed.  He is reliable, and once started on a task, he rarely needs prompting and can usually be depended upon to carry it through to completion. He is a solid performer who can be relied upon to use good judgment, pick a satisfactory approach, and proceed with few errors.

*Id.*  These favorable comments were repeated verbatim on July 28, 2004, less than three months before Mr. Rooney was placed on leave of absence.  *Joint Ex.* 5 at 2.  Although Mr. Seekins mentioned Mr. Rooney's failure to gauge tanks as a part of his performance appraisals in June 2003 and July 2004, he did not include tank gauging as an area of "improvement opportunity" in either appraisal or as part of the major job objectives for the next evaluation period.  *Joint Exs.* 4, 5.

Sprague must demonstrate that the evidence is so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it.  Mr. Rooney's testimony and his positive job reviews, when viewed in the light most favorable to the verdict, undermine Sprague's argument that gauging tanks is an essential function.  Specifically, before his termination, Mr. Rooney was doing the terminal operator job, and was being praised for his work, without gauging tanks.[6]  Based on this evidence, it was reasonable for the jury to find that Mr. Rooney was a qualified individual.  *See White v. N.H. Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir. 2000) ("We may reverse [a denial of a Rule 50(b) motion] only if a reasonable person could not have reached the conclusion of the jury.").  Sprague has not overcome the heavy burden placed on a party challenging a jury verdict and is therefore not entitled to judgment as a matter of law on this issue.

---

[6] Mr. Rooney testified that gauging tanks is an essential function of the terminal operator position, and that Sprague requires all terminal operators to perform tank gauging.  *Trial Tr.* 164:17-22.  The Court must "resolve all credibility issues in favor of the verdict."  *United States v. Scharon*, 187 F.3d 17, 21 (1st Cir. 1999).  The Court determines that the jury either did not find this portion of Mr. Rooney's testimony credible, or, more likely, the jury interpreted Mr. Rooney's testimony to mean that it was essential that some employees gauge tanks.

### 4.   Safety Defense

The Maine Safety Defense imposes on an employer the burden of "establishing that it had a factual basis to believe that, to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or safety of others." *Me. Human Rights Comm'n v. Canadian Pac., Ltd.*, 458 A.2d 1225, 1234 (Me. 1983). This affirmative defense "requires individual assessments of the relationship between an employee's handicap and the specific legitimate requirements of his job." *Id.* The Court has previously held that the jury determined the issue of safety against Sprague. *See Order on Safety Mot.* Regarding this position, Sprague argues "[t]he unanimous, undisputed trial evidence and testimony . . . is so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it." *Def.'s Mot. for J.* at 10.

As just noted, Mr. Rooney introduced evidence that he received a favorable job review in July 2004. On October 15, 2004, Dr. Flynn sent a letter to inform Sprague that Mr. Rooney had "macular degeneration, which affects his central vision." *Joint Ex.* 2. Mr. Rooney testified that he had no discussions with Mr. Seekins about the contents of the Flynn letter. *Trial Tr.* 102:19-25, 103:9-11. Instead, Mr. Rooney said that after Mr. Seekins received the Flynn letter, he "just came up and told me that he'd have to send me home." *Trial Tr.* 103:17-21. Mr. Rooney stated that after October 27, 2004 he was never contacted by Mr. Seekins or anyone else from Sprague concerning accommodations or job modifications. *Trial Tr.* 112:1-13.

Sprague maintains that the information in the October 15, 2004 letter, coupled with the information Dr. Flynn provided in the Certification of Health Care Provider, *Def.'s Ex.* 2, is sufficient to establish that "Sprague had a factual basis to believe, to a reasonable probability, that Plaintiff's physical handicap rendered him at that time and in the future unable to perform his duties

17

or to perform such duties in a manner which will not endanger the health or safety of himself or others."[7]  *Def.'s Mot. for J.* at 20.

The Court is required to "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor."  *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quotation omitted).  Mr. Rooney's testimony concerning the timeline between his favorable job review, Dr. Flynn's letter, his being sent home, and the lack of further communication from Sprague, when viewed in the light most favorable to Mr. Rooney, could establish that Sprague failed to undertake an individualized assessment of the relationship between Mr. Rooney's disability and the specific, legitimate requirements of the terminal operator job, as required under the Maine Safety Defense.[8]  This evidence refutes Sprague's position that the evidence is so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it.  The Court denies Sprague's motion for judgment as a matter of law on the issue of the Maine Safety Defense.

### C.    Motion for Remittitur

#### 1.    Legal Standards

To successfully challenge an award of compensatory damages, the moving party "must establish that the award is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law."  *McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006) (quotation omitted).  The First Circuit has cautioned:

---

[7] Although Dr. Flynn wrote "[c]limbing a ladder, as I believe he does at work, would be unsafe and very difficult to do," *Joint Ex.* 2, he also wrote "[t]here might be parts of some jobs the patient could do now."  *Def.'s Ex.* 2 at 1.  This is precisely the type of factual situation that requires an individualized assessment of the relationship between an individual's disability, and the specific, legitimate requirements of his job.
[8] Defendant's exhibit 2 was signed on November 2, 2004, meaning Sprague could not have relied on this document when it decided to send Mr. Rooney home from work on October 27, 2004.

> We do not reverse a jury verdict for excessiveness except on "the strongest of showings." The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount *any* reasonable man could feel the claimant entitled to."

*Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991) (quoting *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983)). The court in *Azimi* stated: "Translating legal damage into money damages—especially in cases which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken; [f]or just this reason, [w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 236 (1st Cir. 2006) (alteration in original) (quotations omitted). Finally, when reviewing a jury's award of damages, a district court is expected to consider "local community standards and . . . the witnesses' demeanor at the trial." *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir. 1987).

The jury awarded Mr. Rooney $300,000 in compensatory damages.[9] *Special Verdict Form* (Docket # 133). At trial, Mr. and Mrs. Rooney testified concerning the injuries he suffered as a result of being sent home from work. Mr. Rooney testified that when he was sent home on October 27, 2004 he felt "kind of down" and that when he told his wife what had happened, he felt "not very good." *Trial Tr.* 109:13-18. Mr. Rooney agreed that he was concerned about his future. *Trial Tr.* 109:19-21. Mr. Rooney testified that he lives about a half-mile from the

---

[9] This amount has been reduced by the statutory cap to a total of $200,000. *See Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 377-78 (1st Cir. 2004). Mr. Rooney elected to have the entire amount deemed compensatory damages. *See Order on Entering J.* (Docket # 173). After Mr. Rooney filed his Complaint, but before the verdict, the Maine Legislature amended 5 M.R.S.A. § 4613(2)(B)(8)(e)(iii) to increase the compensatory damages cap from $200,000 to $300,000. P.L. 2007, ch. 457, § 1 (effective September 20, 2007). Mr. Rooney has not claimed that the higher cap applies to him. *See* 1 M.R.S.A. § 302 (stating that "[t]he . . . amendment of an Act . . . does not affect . . . any action or proceeding pending at the time of the . . . amendment. . . ."); *Rooney v. Sprague Energy Corp.*, 519 F. Supp. 2d 131 (D. Me. 2007) (addressing amended definition of disability).

Sprague terminal, and that he runs into his coworkers on occasion.  *Trial Tr.* 109:22-25, 110:1-6.

He was friends with some of his coworkers, and socialized with them outside of work, but since

being sent home from work "they just don't bother to come up and see me no more."  *Trial Tr.*

110:7-17.  Mrs. Rooney testified that upon being sent home from work, Mr. Rooney was "very

upset, didn't really know how he was going to make it, and I just told him that, we'll make it."

*Trial Tr.* 366:21-25.  She said that Mr. Rooney socialized with his coworkers before being sent

home, but the number of people who now come to the house has decreased, *Trial Tr.* 368:2-4,

and that they now only socialize with one coworker on a regular basis.  *Trial Tr.* 369:7-11.  Mrs.

Rooney said that Mr. Rooney "hasn't slept good at night at all.  Very quiet at first.  He's not so

bad now as the years go on, but the first of it, he was kind of quiet, and finally, he's worked

himself out of that."  *Trial Tr.* 368:20-23.  She also testified that Mr. Rooney doesn't go out as

much as he used to.  *Trial Tr.* 369:12-14.

     In evaluating a motion for remittitur, the trial court is directed to consider a number of

factors.  First, Sprague is attacking the area of the verdict to which the greatest deference is

accorded:  the translation of intangible, non-economic losses into money damages.  *Azimi*, 456

F.3d at 236.  Further, "First Circuit precedent distinguishes between cases where a jury's verdict

is challenged as improper based only on a damage award that allegedly fails to bear any rational

relation to the evidence of the damages presented at trial, and cases where there is some evidence

of an improper verdict based on factors other than the amount of the damage award."  *Gil de

Rebollo v. Miami Heat Ass'ns*, 137 F.3d 56, 62 (1st Cir. 1998) (citations omitted).  Here, there is

no claim that there were factors other than the amount of the damage award that may have

improperly influenced the size of the verdict.[10]

---

[10] For example, Sprague did not and does not object to the compensatory damages portion of the jury instructions.

The "paramount focus in reviewing a damage award must be the evidence presented at trial." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 579 (1st Cir. 1989). The trial evidence convincingly painted a portrait of a man who had given substantially all his working life to one employer, whose social life centered on his relationships with co-employees, who lived within sight of the Sprague terminal, and who was suddenly and without warning forced to leave work because he had developed a medical condition and had told his employer about it. Mr. Rooney's testimony conveyed a palpable sense of loss and betrayal. The evidence established that Mr. Rooney's identity was a function of his employment and since being placed on the leave of absence, his sense of self has been profoundly altered, leaving him glum and directionless in the shadow of his former employer.

Finally, pursuant to 5 M.R.S.A. § 4613(2)(B)(8)(e)(iii), the Court reduced the total compensatory and punitive damage awards of $450,000 to the statutory maximum of $200,000, all of which Mr. Rooney has elected to treat as compensatory damages. *See Order* at 1 n.1 (Docket # 170). To accord Sprague any relief, the Court would have to reduce the compensatory portion of the damage award to less than $200,000. In view of the evidence at trial, the jury's award for compensatory damages, either as originally issued and certainly as subsequently reduced, is not so grossly disproportionate to the injury established by the evidence as to be unconscionable as a matter of law. The Court denies Sprague's motion for remittitur of damages.

### D.      Motion for a New Trial

#### 1.      Legal Standards

When assessing a motion for a new trial, a trial judge has limited discretion:

A trial judge may not grant a motion for a new trial merely because he or she might have reached a conclusion contrary to that of the jurors, rather, the trial

21

judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.

*Conway v. Electro Switch Corp.*, 825 F.2d 593, 598-99 (1st Cir. 1987).  Sprague begins by revisiting (1) whether Mr. Rooney is a qualified individual, and (2) the Maine Safety Defense. *Def.'s Mot. for New Trial* at 2-4.  For the reasons outlined above, the Court finds that upholding the jury's decisions on these two issues is not against the clear weight of the evidence and does not result in a miscarriage of justice.

Sprague also states it is entitled to a new trial because of alleged confusion caused by the jury being instructed:

> [I]n part erroneously or at a minimum in a misleading, confusing manner, particularly with respect to the safety defense, while at the same time focusing the jury's attention only on pages 8 and 9 of its instructions when deliberating on the interrogatories set forth in the Special Verdict Form, which did not include an interrogatory on the Safety Defense.

*Id.* at 5.  The Court has previously dealt with these issues as well; the Court refers to and incorporates its Order dated May 16, 2008, and adopts its reasoning in this ruling.  *See Order on Safety Mot.*

Next, Sprague asserts that Plaintiff's counsel made "improper and confusing argument to the jury."  *Def.'s Mot. for New Trial* at 5.  Sprague highlights Plaintiff's counsel's statement during closing argument that "the fact that gauging tanks is an essential function of the terminal does not make it an essential function of Ashley Rooney's job . . . ."  *Trial Tr.* 985:13-15. Sprague states that Mr. Rooney's exclusive request for accommodation was to be exempt from tank gauging.  *Def.'s Mot. for New Trial* at 6.  Applying *Phelps*, Sprague declares that tank gauging is an essential function, and "an employer need not exempt an employee from performing essential functions."  *Id.* at 7 (quoting *Phelps*, 251 F.3d at 27).  Therefore, "the only accommodation Plaintiff was requesting was not an accommodation as a matter of law."  *Id.*

Sprague extends this reasoning, insisting that "[w]hen no accommodations are requested, save for exemption from tank gauging which is not reasonable as a matter of law, there is no interactive process to be conducted." *Id.* at 8. Completing the argument, Sprague maintains that the Court erred in giving instruction on the interactive process, because Sprague was not required to engage in an interactive process if no reasonable accommodations were requested. *Id.*

First, Sprague failed to establish that tank gauging is an essential function of the terminal operator position. Therefore, Mr. Rooney's request to be exempt from gauging tanks does not fall under the *Phelps* umbrella, and is a demand for a reasonable and effective accommodation. This request for accommodation, made by Mr. Rooney via Dr. Flynn's letter to Duane Seekins, *Joint Ex.* 2, was sufficient to trigger the interactive process.[11]

Second, Sprague's contention misstates its obligation regarding the interactive process. The First Circuit resolves "on a case-by-case basis" an employer's obligation to engage in the interactive process. *Kvorjak v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001). In *Kvorjak*, the court noted that "there may be situations in which failure to engage in the process 'would constitute a failure to provide reasonable accommodation.'" *Id.* (quoting *Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996)). Although the court observed that an employer's failure to engage in the interactive process is "of no moment if the record forecloses a finding that the plaintiff could perform the duties of the job," *id.*, the record here does just the opposite. The jury not only reasonably found that Mr. Rooney was a qualified individual, but it also could have

---

[11] At trial, Sprague vigorously contended that the Flynn letter was not as a matter of law sufficient to trigger its obligation to engage in an interactive process. Although agreeing with Sprague that Mr. Rooney's evidence was very, very thin, the Court instructed the jury not only on the employer's obligation, but also on the employee's duty to make a request that is "sufficiently direct and specific" and that "must explain how his request is related to his disability." *Tr.* 816:1-25; 817:1-25; 817:1-25; 818:1-25 819:1-25; 820:1-25; 821:1-25; 822:1-25; 823:1-25; 824:1-25; 965:9-25; 966:1-9. Before the verdict, it was an open question whether the jury would accept Mr. Rooney's contentions about whether he triggered Sprague's obligation to engage in an interactive process; post-verdict, however, the case assumes a markedly different posture and the Court must assume that the jury made factual findings consistent with its verdict. *McMillan*, 140 F.3d at 299.

concluded that Dr. Flynn's letter to Duane Seekins, *Joint Ex.* 2, coupled with the information Dr. Flynn provided in the Certification of Health Care Provider, *Def.'s Ex.* 2, was sufficient to trigger Sprague's obligation to engage in the interactive process.

Completing its motion, Sprague states: "*Only after the jury's verdict*, did Plaintiff submit to Defendant a 'direct and specific request' by letter proposing a litany of previously undisclosed accommodations." *Def.'s Mot. for New Trial* at 10. Sprague refers to a three-page letter to Duane Seekins from Ashley Rooney dated November 27, 2007, nearly a month after the jury verdict. *Pl.'s Ex.* 51-BP. This letter states in part: "In anticipation of a possible return to work, and in consideration of the limitations imposed by my eyesight problems, I am requesting the following accommodations so that I may perform the essential functions of the job of terminal operator." *Id.* The letter goes on to list fifteen possible accommodations, along with jobs that Mr. Rooney said he could perform at the Sprague terminal. Sprague asserts:

> Plaintiff not only withheld this evidence from Sprague during the entirety of this litigation, while arguing vigorously for punitive damages based on an alleged failure to engage in the interactive process, the jury was not permitted to consider whether these proposed accommodations are "reasonable," "effective," or whether Plaintiff was a "qualified individual" in light of these requests. At minimum, Sprague is entitled to a new trial based on evidence newly discovered even after the jury's verdict, as well as other reasons Fed. R. Civ. P. 59(a).

*Def.'s Mot. for New Trial* at 10. Mr. Rooney responds:

> After the jury returned a verdict in his favor and in anticipation of being reinstated to his job, Plaintiff, with counsel, composed and sent a letter to Sprague suggesting certain accommodations. Those suggestions are not "evidence" and nothing was "withheld" from Sprague during discovery. That letter is not newly discovered evidence; indeed, it is in the nature of settlement negotiations and is inadmissible under F.R.Evid. 408.

*Pl.'s Resp. – Mot. for New Tr.* at 2 n.2.

The Court is perplexed by Sprague's attempt to raise asserted discovery violations in support of its motion for new trial. Exactly how Mr. Rooney was supposed to produce before

24

trial a letter that was written after the verdict remains a mystery.  In any event, the Court concludes that Sprague's vigorous assertions of unfairness do not meet the standards for a new trial under Rule 59(a).

## III.   CONCLUSION

The Court DENIES Sprague Energy Corp.'s Motion for Reconsideration of Equitable Remedies Order (Docket # 175), its Motion for Judgment as a Matter of Law (Docket # 176), its Motion for Remittitur of Damages (Docket # 177), and its Motion for a New Trial (Docket # 178).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 9th day of October, 2008